USCA1 Opinion

 

 March 12, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _____________________ No. 92-1542 BRUCE A. HOWELL, ET AL., Plaintiffs, Appellants, v. FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR ELIOT SAVINGS BANK, Defendant, Appellee _____________________ ERRATA SHEET The opinion of this court issued on February 17, 1993 is amended as follows: On page 4, third line of footnote 1, replace "charges" with "changes". February 17, 1993 UNITED STATES COURT OF APPEALS For The First Circuit ____________________ No. 92-1542 BRUCE A. HOWELL, ET AL., Plaintiffs, Appellants, v. FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR ELIOT SAVINGS BANK, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Higginbotham, Senior Circuit Judge,* ____________________ and Boudin, Circuit Judge. _____________ ____________________ Edwin A. McCabe with whom Karen Chinn Lyons, Joseph P. Davis, ________________ __________________ _________________ III, The McCabe Group, and Lawrence Sager were on brief for appellant. ___ ________________ ______________ Lawrence H. Richmond, Counsel, Federal Deposit Insurance _______________________ Corporation, with whom Ann S. DuRoss, Assistant General Counsel, _______________ Federal Deposit Insurance Corporation, Colleen B. Bombardier, Senior ______________________ Counsel, Federal Deposit Insurance Corporation, John C. Foskett, ________________ Michael P. Ridulfo and Deutsch Williams Brooks DeRensis Holland & _________ _________ _____________________________________________ Drachman, P.C. were on brief for appellee. _____________ ____________________ February 17, 1993 ____________________ _____________________ *of the Third Circuit, sitting by designation. BOUDIN, Circuit Judge. Appellants in this case are _____________ former officers of a failed bank. They sued the FDIC as the bank's receiver when the FDIC disallowed their claims for severance pay under their contracts with the bank. The district court sustained the FDIC, reasoning that Congress had restricted such claims. Although the statute in question is not easily construed and the result is a severe one, we believe that the officers' claims fail, and we sustain the district court. The facts, shorn of flourishes added by the parties, are simple. In 1988 and 1989, the four appellants in this case were officers of Eliot Savings Bank ("Eliot") in Massachusetts. In November 1988, when Eliot was undergoing financial strain, Eliot made an agreement with Charles Noble, its executive vice president, committing the bank to make severance payments (computed under a formula but apparently equivalent to three years' salary) if his employment were terminated. In August 1989, the bank entered into letter agreements with three other officers--appellants Bruce Howell, Patricia McSweeney, and Laurence Richard--promising them each a year's salary as severance in the event of termination. Finally, in December 1989 a further letter agreement was made with Noble, reaffirming the earlier agreement with him while modifying it in certain respects. -2- -2- The agreements make clear that they were not intended to alter the "at will" employment relationship between Eliot and the officers. The bank remained free to terminate the officers, subject to severance payments, and (so far as appears) the officers were not bound to remain for any fixed term. The letter agreements with the three officers other than Noble state that the severance payments were promised in consideration of the officers' "willingness to remain" in the bank's employ; and the same intent can be gleaned from the two agreements with Noble. The weakened financial condition of the bank is adverted to in each of the four 1989 agreements. At some point in 1989 the FDIC began to scrutinize closely Eliot's affairs. The officers allege, on information and belief, that the FDIC and the bank agreed that Eliot would take steps to retain its qualified management; and the complaint states that the FDIC "knew and approved" of the four letter agreements made in 1989. The officers also contend that they were advised by experienced counsel at a respected law firm that the severance agreements were valid and would withstand an FDIC receivership if one ensued. It is further alleged that, in December 1989, the FDIC and the bank entered into a consent order that provided that the bank would continue to retain qualified management. -3- -3- Eliot failed and was closed on June 29, 1990. The FDIC was appointed its receiver. Within two months, the officers were terminated. The officers then made administrative claims for their severance benefits pursuant to applicable provisions of FIRREA, 12 U.S.C. 1821(d)(3), (5), the statute enacted in 1989 to cope with the torrent of bank failures.1 In October 1990, the FDIC disallowed the claims, stating that the claims violated public policy. Although the FDIC letter is not before us, it apparently is based upon the FDIC's general opposition to what are sometimes called "golden parachute payments," a subject to which we will return. Following the disallowance, the officers pursued their option, expressly provided by FIRREA, to bring an original action in federal district court. 12 U.S.C. 1821(d)(6). In their district court complaint, the officers asserted claims against the FDIC for breach of contract, for breach of the contracts' implied covenant of fair dealing, and for detrimental reliance. The FDIC moved to dismiss or for summary judgment. Thereafter, the officers sought to amend their complaint by adding a promissory estoppel claim and by ____________________ 1FIRREA is the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 103 Stat. 183, codified in various sections of 12 and 18 U.S.C. Among other changes, FIRREA amended pre-existing provisions specifying the FDIC's powers as receiver and the claims provisions governing claims against failed banks. -4- -4- explicitly naming the FDIC in its "corporate capacity" as well as in its capacity as receiver. In a bench decision, the district judge ruled that the FDIC had lawfully repudiated the contracts between Eliot and the officers and that under FIRREA there were no compensable damages for the resulting breach. As for the promissory estoppel claim, the court deemed it "futile" and refused to allow the amendment; the court referred to the general principle that estoppel does not operate against the government and to the FDIC's broad grant of authority under FIRREA. The officers then sought review in this court. The first claim made on appeal, taken in order of logic, is that the FDIC's repudiation of the severance agreements was itself invalid. At this point we need to explain briefly the structure of the statute. Section 1821 governs, among other matters, the powers of the FDIC as receiver, 12 U.S.C. 1821(d), the procedure for processing claims against the failed bank, 12 U.S.C. 1821(d)(3), (5), and substantive rules for contracts entered into prior to the receivership. 12 U.S.C. 1821(e). Section 1821(e)(1) gives the receiver the right to disaffirm or repudiate any contract that the bank may have made before receivership if the FDIC decides "in its discretion" that performance will be "burdensome" and that disavowal will "promote the orderly administration" of the failed bank's affairs. 12 U.S.C. 821(e)(1). -5- -5- The power of a receiver to repudiate prior executory contracts made by the debtor, a familiar incident of bankruptcy law, see 11 U.S.C. 365 (executory contracts and unexpired leases), means something less than might appear. By repudiating the contract the receiver is freed from having to comply with the contract, e.g., American Medical Supply, ___ ________________________ Inc. v. FTC, 1990 U.S. Dist. LEXIS 5355 (D. Kan. 1990) ___ ___ (specific enforcement), but the repudiation is treated as a breach of contract that gives rise to an ordinary contract claim for damages, if any. Whether that claim is then "allowed" by the receiver and if so whether there are assets to satisfy it, are distinct questions; at this point we are concerned only with the receiver's authority to affirm or disaffirm. In this case the officers do not dispute that the FDIC did repudiate the severance agreements. Rather the officers argue that the repudiation is ineffective, and the agreements remain enforceable, because the FDIC did not make the statutory findings, or abused its discretion, or both. Interesting questions are posed by such a challenge, but the questions need not be resolved in this case. The claim was not made in the district court and, accordingly, it is waived. Clauson v. Smith, 823 F.2d 660, 666 (1st Cir. 1987). _______ _____ The complaint makes only the barest reference to abuse of discretion by the FDIC, mentioning it not as a separate claim but in the prefatory description of facts; and there is no -6- -6- reference whatever to this line of argument, or to lack of required FDIC findings, in the opposition filed by the officers to the FDIC's motion to dismiss. A litigant would normally have an uphill battle in overturning an FDIC finding of "burden," if the FDIC made one, but in all events the issue has not been preserved in this case. The second ground of appeal raises the central question before us, namely, whether a damage claim based on a repudiated severance contract is allowed under FIRREA. A stranger to FIRREA might think it apparent that breach of a contract to make severance payments inflicts damages on a discharged employee in the amount of the promised payments. The hitch is that in FIRREA Congress adopted restrictive rules that limit the damages permitted for repudiated contracts. 12 U.S.C. 1821(e). In a general provision subject to certain exceptions, 12 U.S.C. 1821(e)(3)(A)(i) provides that the receiver's liability for a repudiated contract is "limited to actual direct compensatory damages . . . ." Additionally, section 1821(e)(3)(B) provides: For purposes of subparagraph (A), the term `actual direct compensatory damages' does not include-- (i) punitive or exemplary damages; (ii) damages for lost profits or opportunities; or (iii) damages for pain and suffering. The question thus framed is whether, or to what extent, the statute's limitation to "actual direct compensatory damages" bars the contractual severance claims made in this -7- -7- case.2 The question is easy to state but less easy to answer. Although FIRREA's concept of limiting allowable claims for contract damages echoes the approach of the Bankruptcy Code, 11 U.S.C. 502, that statute is more specific and informative. In particular, section 502(b)(7) limits claims by a terminated employee for future compensation to one year's pay. So far as appears from the parties' briefs, FIRREA's broad exclusionary language ("actual direct compensatory damages") has been plucked out of the air by Congress, although the general purpose is obvious enough. If there is any illuminating legislative history or precedent, it has not been called to our attention by the parties and we have been unable to locate anything very helpful. It is fair to guess that Congress, faced with mountainous bank failures, determined to pare back damage claims founded on repudiated contracts. In all likelihood, the legislators knew that many uninsured depositors and other unsecured creditors would recover little from failed banks; and the government's own liability (to insured depositors) would be effectively increased to the extent that remaining assets went to contract-claim creditors of the bank rather than to the government (as the subrogee for the insured ____________________ 2We do not reach the FDIC's alternative argument that the severance pay would be barred as representing "lost profits or opportunity." -8- -8- depositors whom the FDIC compensated directly). It is thus not surprising that Congress might wish to disallow certain damage claims deemed less worthy than other claims. This assessment casts some light on Congress' approach and provides a predicate for considering the severance contract claims posed in this case. We conclude, not without some misgivings, that the officers' claims do not comprise allowable claims under FIRREA. The amounts stipulated by the Eliot contracts are easily determined--a formula payment for Noble and a year's pay for the others. But the statute calls upon the courts to determine the nature of the damages stipulated by the ______ contract or sought by the claimant in order to rule out any but those permitted by Congress. In this case, analysis persuades us that the damages provided by Eliot's repudiated severance contracts with its officers, and sought by the appellants for their breach in this case, are not "actual direct compensatory damages" under 12 U.S.C. 1821(e)(1)(A)(i). Severance payments, stipulated in advance, are at best an estimate of likely harm made at a time when only prediction is possible. When discharge actually occurs, the employee may have no way to prove the loss from alternative employments foregone, not to mention possible disputes about the discharged employee's ability to mitigate damages by -9- -9- finding new employment. A severance agreement properly protects against these uncertainties by liquidating the liability. Such payments comprise or are analogous to "liquidated damages," at least when the amount is not so large as to constitute an unenforceable penalty. See ___ generally E. Allan Farnsworth, Contracts 12.18 (2d ed. _________ _________ 1990); Charles McCormick, Damages 146 (1935).3 _______ Unfortunately for the appellants, the statutory language--"actual direct compensatory damages"--does not quite embrace the payments promised by the officers' severance agreements. Eliot's officers may, or may not, have suffered injury by remaining at the bank, depending on what options they had in the past that are not available now. Conceivably, they suffered no damage at all; conceivably, their actual damages from staying at Eliot exceed the amounts stipulated in the agreements. The point is that severance payments of this class do not comprise actual damages. Thus, based on statutory language alone, the starting point for ____________________ 3Of course, the other office of a severance agreement may be to provide a cause of action for an at will employee who otherwise has no contractual claim at all. E.g., Pearson ____ _______ v. John Hancock Mutual Life Ins. Co., 979 F.2d 254, 258 (1st __________________________________ Cir. 1992). In this case, the at will status of the appellants is not decisive; they did have contracts and our task is to see whether the promised payments fit into FIRREA's compensable-damage pigeonhole. -10- -10- statutory construction, the FDIC appears to have the better case. One might argue that, although the severance payments are not actual damages, they are often a good-faith effort to estimate such damages and should in such cases be permitted as consistent with the spirit of the statute, if not its language. But the spirit of the statute is quite otherwise. The statute actually excludes (see 12 U.S.C. 1821(e)(3)(B)) two less-favored categories of what are indisputably actual damages (lost profits, pain and suffering), reinforcing the impression that Congress intended strictly to limit allowable claims for repudiated contracts. The treatment of leases in the next subsection is yet further evidence of Congress' temper. 12 U.S.C. 1821(e)(4) provides that, if the receiver disaffirms a lease to which the bank was lessee, the lessor's damages are limited to past rent and loss of future rent is not compensable. Yet the lessor may have accepted a lower monthly rent in exchange for a long-term lease and protection against the risk of an empty building. As with severance pay, the lessor may have foregone other opportunities but the loss is not to be recompensed. Each side has offered in its favor still broader policy arguments. The officers claim that the disallowance of promised severance pay will mean that a troubled bank cannot effectively contract to retain able officers who may rescue -11- -11- it. The FDIC, by contrast, implies that the present arrangements may be "golden parachutes" by which insiders take advantage of the crisis to assure themselves of a handsome farewell gift from a failing bank. The FDIC also points to regulations it has proposed, but not yet adopted, to curtail severely such arrangements; its new rules would disallow severance contracts for bank officials except in narrowly defined conditions, such as where an officer is induced to leave another post to help a troubled thrift.4 _____ The FDIC claims that the regulations and their authorizing statute reflect public policy. The policy arguments of the officers and the FDIC may each have some force, to some extent they offset each other, and neither set is decisive in this case. In answer to the officers, it may be said that their argument presents a fact and policy question best left to Congress and to expert bank regulators; those bodies in turn have ample incentives to make the right adjustment in delimiting severance agreements. As to the FDIC's argument, Congress has not declared severance payments unlawful but merely authorized the FDIC to do so, and the latter's proposed regulations are not yet in ____________________ 4The regulations were proposed on October 7, 1991, 56 Fed. Reg. 50529, pursuant to the Comprehensive Thrift and Bank Fraud Prosection and Taxpayer Recovery Act of 1990, 104 Stat. 4859, adding 12 U.S.C. 1828(k) (FDIC "may prohibit or limit, by regulation or order, any golden parachute payment . . . ."). -12- -12- force. Further, this case arises on a motion to dismiss, so there is no basis whatever for considering any imputation of bad motive or misconduct on the part of Eliot's officers. The officers' last argument in support of their contract claims is that the "actual damage" restriction, if read as the FDIC urges, is an unconstitutional taking. Alternatively, they say that the statute is so close to the line that it should be read favorably to them to avoid a constitutional question. These arguments were not made in the district court and we decline to consider them. Litigation is a winnowing process and, except in criminal cases where the stakes are different, only in extraordinary circumstances will we take up a contention that has not been made in the district court. We note that arguments that the FDIC might itself have made, but did not, have been similarly ignored, including a possible claim that its order _____ disallowing the severance claims is a currently effective "order" under the golden parachute statute, 12 U.S.C. 1828(k). What remains to be considered are the detrimental reliance claim in the original complaint and the related promissory estoppel claim advanced by the attempted amendment. In substance, the officers argue that the FDIC, acting in its supervisory or "corporate" capacity prior to Eliot's failure, was so closely associated with the bank's -13- -13- severance promises that their repudiation by the FDIC as receiver violates estoppel doctrine or gives rise to a new claim against the FDIC. That the FDIC was implicated in forming the severance contracts is a factual proposition, apparently denied by the FDIC, but we must accept the proposition as true for purposes of reviewing the motion to dismiss. The FDIC seeks to answer the officers' estoppel and reliance argument by citing to cases that say that the FDIC is treated as two separate persons when acting in its "corporate" capacity as a regulator and when acting in its capacity as receiver. E.g., FDIC v. Roldon Fonseca, 795 F.2d ___ ____ ______________ 1102, 1109 (1st Cir. 1986). On this theory, the FDIC is not liable in this case as regulator, even if it affiliated itself with the promise of severance pay, since "it" (the FDIC as regulator) did not break the promise; and as receiver, the FDIC was free to disavow the contracts because "it" (the FDIC as receiver) made no promises. The officers argue that this "separate capacities" doctrine was designed for a different purpose and should not be applied in the present context to produce an unjust result. But the Eighth Circuit applied this doctrine without much hesitation to a case in which the FDIC as receiver sought to repudiate a lease it had previously accepted in its capacity as "conservator," conservator being yet another -14- -14- incarnation in which the FDIC sometimes appears. RTC v. ___ CedarMinn Building Limited Partnership, 956 F.2d 1446 (8th _______________________________________ Cir.), cert. denied, 113 S. Ct. 94 (1992). As for the ____ ______ claimed injustice, it is not clear that any apparent inequity worked in this case is greater than occurs in the usual case in which the separate-capacities doctrine is invoked. FDIC ____ v. Roldon Fonseca, 795 F.2d at 1109. ______________ There is another answer to the officers' claim that rests more solidly on visible policy. Putting to one side the separate capacities defense, courts are for obvious reasons reluctant to permit estoppels against the United States, e.g., Heckler v. Services of Crawford County, 467 ___ _______ _____________________________ U.S. 51, 60 (1984), although exceptions may be found. United ______ States v. Pennsylvania Industrial Chemical Corp., 411 U.S. ______ ______________________________________ 655, 670-675 (1973). There are many reasons for the reluctance, including a concern for the public purse and a recognition that the government--unlike the normal actor--is an enterprise so vast and complex as to preclude perfect consistency. See generally Hansen v. Harris, 619 F.2d 942, _____________ ______ ______ 649-58 (2d Cir. 1980) (Friendly, J., dissenting), rev'd sub _____ ___ nom. Schweiker v. Hansen, 450 U.S. 785 (1981). While leaving ___ _________ ______ many questions unanswered, the Supreme Court has made clear that an estoppel against the United States is not measured by the rules used for ordinary litigants. Heckler, 467 U.S. at _______ 62. -15- -15- In the present case, even the most liberal reading of the reliance and estoppel counts leaves the FDIC in the position of one who encouraged or invited the bank's promise of severance pay. Yet (as we construe the actual damages clause), Congress has decided that, in parceling out fairly the limited assets of a failed bank, contract damages reflecting severance pay are not permitted. "[T]o permit [the claim] . . . would be judicially to admit at the back door that which has been legislatively turned away at the front door." FDIC v. Cobblestone Corp., 1992 U.S. Dist. ____ _________________ LEXIS 17024 (D. Mass. 1992). It is hard to imagine a less attractive case for creating a new judicial exception to the general rule against estoppel of the government. The judgment of the district court is affirmed. ________ -16- -16-