**Malcolm MARSA, Plaintiff,**

v.

**METROBANK FOR SAVINGS, F.S.B. and Metrobank Financial Group, Inc., Defendants.**

Civ. A. No. 91–3426.

United States District Court, D. New Jersey.

June 8, 1993.

Christine Carey Lilore, Sokol, Behot & Fiorenzo, Hackensack, NJ, for plaintiff.

David L. Fox, Lane, Felcher, Kurlander & Fox, P.C., New York City, for defendants.

## OPINION

HAROLD A. ACKERMAN, District Judge:

This matter comes before the court on the motions of plaintiff Malcolm Marsa ("Marsa") and defendant Resolution Trust Corporation ("RTC")[1] for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, Marsa's motion is granted and the RTC's motion is denied.

### I. Factual Background

The following facts are undisputed.

Plaintiff Marsa is the former President and Chairman/Chief Executive Officer of Metrobank for Savings F.S.B. ("Metrobank F.S.B.") and Metrobank Financial Group, Inc. ("Metrobank Financial") ("collectively Metrobank"). Marsa resigned from Metrobank on May 10, 1990 pursuant to a "Settlement Agreement and Release" ("Settlement Agreement") executed by the parties that same date.

At the time of his resignation, the terms of Marsa's employment with Metrobank were governed by an employment agreement, dated January 1, 1988 ("Employment Agreement"). The initial term of the Employment Agreement was to end December 31, 1992, at which time it was to be automatically renewed to December 1994. The Employment Agreement provided for a base salary of $270,000, plus fringe benefits. Including benefits, Marsa's total yearly earnings were approximately $400,000.

In 1989 and 1990, Metrobank suffered considerable losses. Specifically, the 1989 and

---

1. The RTC was substituted as a defendant in this action by Order dated September 10, 1991.

1990 Annual Reports for Metrobank Financial show a net income loss for the year ending December 31, 1989 of $20,493,000 and a net income loss for the year ending December 31, 1990 of $8,330,000. According to the Settlement Agreement, these losses prompted Metrobank to downsize its operations. As a result of the downsizing, Marsa's services were no longer needed and the parties entered into the Settlement Agreement, terminating Marsa's relationship with Metrobank.

According to the Settlement Agreement, Marsa had a claim under the Employment Agreement for approximately $1.8 million (four and one-half years remaining under the Employment Agreement × $400,000 per year) plus fringe benefits. Pursuant to the Settlement Agreement, the parties agreed to the following:

1) Marsa immediately resigned as an officer, director and employee of Metrobank and its subsidiaries;

2) The Employment Agreement was terminated and Marsa waived all future salary and benefits thereunder;

3) Marsa agreed to receive immediately, upon execution of the Settlement Agreement, a lump sum payment of $250,000, and an annual fee of $100,000, payable in monthly installments over the succeeding 4 years starting in 1991 and continuing to 1994. In addition, Marsa agreed to sign over all insurance benefits to Metrobank;

4) Marsa agreed that, upon the reasonable request of Metrobank, he would cooperate with Metrobank in connection with any matters pertaining to the business of Metrobank and/or in connection with any litigation against Metrobank; and

5) Marsa agreed to release Metrobank from any claims and rights against Metrobank, including any claims arising under the Employment Agreement.

The Settlement Agreement also provided as follows:

In the event any party fails to comply with or breaches any of its obligations under this Settlement Agreement, the other party shall have the right to bring an action against the defaulting party for enforcement of its or his obligations thereunder, and for direct and actual damages caused by such default.

Settlement Agreement at 3, ¶ 6.[2]

On June 14, 1991, thirteen months after the Settlement Agreement was executed, the Board of Directors of Metrobank F.S.B., by resolution, consented to the appointment of a conservator or receiver. On June 27, 1991, the Office of Thrift Supervision ("OTS") appointed the RTC as Receiver for Metrobank F.S.B. pursuant to Order No. 91–394 on the basis that the "OLD THRIFT [Metrobank F.S.B.] is in an unsafe and unsound condition to transact business due to having substantially insufficient capital, in that OLD THRIFT has tangible capital of only .8% and is failing all of its capital requirements." *See* Order No. 91–394. Pursuant to that same order, the OTS appointed the RTC as Conservator for Metrobank Federal Savings and Loan Association, the new thrift that was taking over the assets of Metrobank F.S.B. In addition, James P. Allen ("Allen") was appointed Managing Agent for Metrobank F.S.B.

On June 28, 1991, the RTC disaffirmed, in writing, both the Employment Agreement and the Settlement Agreement, relying on 12 U.S.C. § 1821(e)(1). Since the disaffirmance, Marsa has not received any monthly installments due under the Settlement Agreement. Accordingly, Marsa commenced this action in April 1991, seeking to recover the $400,000 he claims is still due him under the Settlement Agreement, as well as attorneys' fees and costs.[3]

II. Discussion

■ The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), and the regulations promulgat-

---

**2.** The Settlement Agreement also provided that "[t]he prevailing party in any such action shall be entitled to an award of reasonable attorney's fees incurred in connection therewith." *Id.*

**3.** Marsa commenced the action in the Supreme Court of New Jersey, Law Division, Bergen County. On August 5, 1992, the RTC removed this action to the United States District Court for the District of New Jersey.

ed thereunder, confer broad powers on receivers and conservators of failed depository institutions, *Gross v. Bell Sav. Bank,* 974 F.2d 403, 407 (3d Cir.1992), including the power to terminate contracts to which the failed institution is a party. The RTC relies on two sources for its disaffirmance of the Settlement Agreement between Marsa and Metrobank: 12 U.S.C. § 1821(e) and 12 C.F.R. § 563.39.

Marsa argues that the RTC did not have authority to repudiate the Settlement Agreement under either 12 U.S.C. § 1821(e) or 12 C.F.R. § 563.39 because his rights to payment under the agreement had vested. The RTC, in turn, argues that it was indeed authorized to repudiate the Settlement Agreement pursuant to both 12 U.S.C. § 1821(e) and 12 C.F.R. § 563.39 and that Marsa's rights had not vested under the agreement.[4] Inasmuch as the issues raised by these arguments present questions of statutory and contract interpretation, this matter appears ripe for disposition on summary judgment.

### A. Standard for Summary Judgment

■ Summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.), *cert. dism'd,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Put differently, "summary judgment may be granted if the movant shows that there exists no genuine issues of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital,* 843

F.2d 139, 143 (3d Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A fact is material if it influences the outcome under the governing law. *Id.* at 248, 106 S.Ct. at 2510.

■ Within the framework set out above, the moving party essentially bears two burdens. First, there is the burden of production, of making a prima facie showing that it is entitled to summary judgment. This may be done either by demonstrating that there is no genuine issue of fact and that as a matter of law, the moving party must prevail, or by demonstrating that the nonmoving party has not shown facts relating to an essential element of the issue for which it bears the burden. Once either showing is made, this burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. Second, there is the burden of persuasion. This burden is a stringent one which always remains with the moving party. If there remains any doubt as to whether a trial is necessary, summary judgment should not be granted. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 330–33, 106 S.Ct. 2548, 2556–58, 91 L.Ed.2d 265 (1986); Advisory Committee's Notes on Fed.R.Civ.P. 56(e), 1963 Amendment; *see generally* C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (2d ed. 1983).

### B. 12 C.F.R. § 563.39

■ Under 12 C.F.R. § 563.39(b)(5),[5] all obligations under employment contracts be-

---

4. In its briefs, the RTC also argues that it properly repudiated the Employment Agreement between Marsa and Metrobank. Marsa, however, is claiming that he is entitled to benefits only under the Settlement Agreement. This court will therefore address Marsa's rights under that agreement only.

5. The RTC also cites to 12 C.F.R. § 563.39(a) which states in pertinent part: "A [savings] asso-

ciation shall not enter into an employment contract with any of its officers or other employees if such contract would constitute an unsafe or unsound practice." Subsection (b)(5), however, deals specifically with termination of employment contracts and is the provision directly applicable in this case. The case cited by RTC which applied subsection (a), *Federal Sav. & Loan Ins. Corp. v. Bass,* 576 F.Supp. 848 (N.D.Ill. 1983), is inapposite to the facts of this case. In

tween an insured institution and its employees are terminated by operation of law when the receiver determines that the institution is in an unsafe or unsound condition.[6] *See Rush v. Federal Deposit Ins. Corp.,* 747 F.Supp. 575, 577 (N.D.Cal.1990). Rights that have already vested, however, will not be affected by termination of the contract. *Id.* ("Under Section 563.39(b)(5), rights that have vested prior to the regulation's triggering events are not terminated."). The regulation provides in relevant part:

All obligations under the [employment] contract shall be terminated, except to the extent determined that continuation of the contract is necessary for the continued operation of the institution ... by the Director or his or her designee ... when the association is determined by the Director to be in an unsafe or unsound condition. Any rights of the parties that have already vested, however, shall not be affected by such action.

12 C.F.R. § 563.39(b)(5).

Both Marsa and the RTC assume, without discussion, that the Settlement Agreement is an employment contract within the meaning of 12 C.F.R. § 563.39(b)(5). That the Settlement Agreement constitutes an employment contract is far from clear, however. The term "employment contract" is not defined in either the regulation or in the statute itself. Courts that have addressed the issue have relied on the definition contained in Black's Law Dictionary, which defines "employment contract" as "an agreement or contract between employer and employee in which the terms and conditions of one's employment are provided." *Black's Law Dictionary* (6th ed. 1990); *see Rice·v. Resolution Trust Corporation,* 785 F.Supp. 1385, 1390 (D.Ariz. 1992); *Fresca v. Federal Deposit Insurance Corporation,* 818 F.Supp. 664, 667 (S.D.N.Y. 1993). In *Rice,* the court held that a "Salary Continuation Agreement" constituted an employment contract within the meaning of 12

C.F.R. § 563.39(b)(5) because the agreement set forth the general terms and conditions of the plaintiff's employment and because it was the only agreement that governed the plaintiff's employment while he was at the bank. 785 F.Supp. at 1389–90. In contrast, in *Fresca,* the court suggested that an early retirement package did not constitute an employment contract because the agreement did not set out the terms of the plaintiff's employment and did not envision the plaintiff's continued employment. 818 F.Supp. at 667.

■ Similar to the agreement at issue in *Fresca,* the Settlement Agreement in this case does not set forth the conditions and terms of Marsa's employment. Rather, it *terminated* Marsa's employment and effectively *replaced* the agreement that governed the terms of Marsa's employment with Metrobank. I therefore find that the Settlement Agreement is not an employment agreement within the meaning of 12 C.F.R. § 563.39 and that, as a consequence, the RTC did not have authority pursuant to that regulation to terminate Marsa's agreement with Metrobank.

■ Even if the Settlement Agreement were interpreted as an employment contract governed by 12 C.F.R. § 563.39, I find that Marsa's rights to payment were vested at the time the RTC was appointed receiver and therefore could not be impaired by any purported disaffirmance. Rights under an agreement will be deemed vested if they are not subject to a condition precedent or, stated differently, are unconditional. *See, e.g., Wilde v. First Federal Sav. & Loan Ass'n of Wilmette,* 134 Ill.App.3d 722, 89 Ill.Dec. 493, 480 N.E.2d 1236 (1985); *Federal Sav. & Loan Ins. Corp. v. Quinn,* 711 F.Supp. 366 (N.D.Ohio 1989), *vacated on other grounds,* 922 F.2d 1251 (6th Cir.1991). For example, in *Wilde,* the plaintiff was discharged pursuant to 12 C.F.R. § 563.39(b)(5) and subsequently sued for severance benefits under an

---

*Bass,* the FSLIC commenced an action to attack the validity of existing employment contracts, which the court properly examined in light of subsection (a). *Bass* did not involve the issue of whether an employee is entitled to benefits under a terminated employment agreement. This issue is appropriately resolved under subsection (b)(5).

6. It is undisputed that Metrobank was determined to be in an unsafe and unsound financial condition by the OTS. *See* Order No. 91–394.

664

employment contract. The contract provided for benefits in the event the employee was terminated without cause. In denying benefits, the court reasoned that termination without cause was a condition precedent to vesting of the employment agreement, stating, "[a]s plaintiff's benefits are dependent upon the happening of a contingency—termination without cause—they do not 'vest' until such contingency occurs." 89 Ill.Dec. at 499, 480 N.E.2d at 1242. Because the agreement expired by operation of law under 12 C.F.R. § 563.39(b)(5) prior to the actual termination of the plaintiff's employment, vesting could not have taken place. *Id.* In *Quinn*, the plaintiff's employment contract also provided for benefits upon termination without cause. The court looked to caselaw under the Employee Retirement Income Security Act of 1974 ("ERISA") to determine the definition of vesting. Under ERISA, the term "vested" has been defined as an unconditional claim arising from a plan participant's service. Because the plaintiff's employment in that case was terminated by operation of law prior to the triggering event of "termination without cause," his right was conditional and, accordingly, not vested. 711 F.Supp. at 379. *See also Rice,* 785 F.Supp. at 1391 (following approach of *Quinn* and *Wilde); Rush,* 747 F.Supp. at 578 (same).

In this case, Marsa's rights to payment under the Settlement Agreement vested at the time he executed the agreement and resigned from Metrobank, over one year prior to the bank's takeover by the RTC and the RTC's disaffirmance of the Settlement Agreement. There was no condition precedent to receipt of the benefits under the Settlement Agreement. *See Fresca,* 818 F.Supp. at 667 (plaintiff's rights under retirement agreement vested at the time of her retirement from the company, which occurred *prior to* appointment of receiver); *Rice,* 785 F.Supp. at 1392 (noting, in *dicta,* that vesting would occur where employee had been terminated without cause *prior to* appointment of receiver).

 The RTC argues, however, that under the Settlement Agreement, plaintiff had a continuing obligation to cooperate with Metrobank in future litigation or legal matters involving Metrobank. The RTC therefore concludes that Marsa's right to payment under the Agreement was conditional and therefore not vested. I disagree. There is nothing in the Settlement Agreement indicating that Marsa's right to payment was conditioned upon his cooperating with Metrobank in future litigation. Rather, Marsa's obligation to cooperate in litigation constitutes a promise or duty, not a condition precedent to Metrobank's obligation to make payment.

Condition precedents are disfavored by the courts. *See Castle. v. Cohen,* 840 F.2d 173, 177 (3d Cir.1988) ("Since the failure to comply with a condition precedent works a forfeiture, such conditions are disfavored."); *Standefer v. Thompson,* 939 F.2d 161, 164 (4th Cir.1991) (law does not favor conditions precedent but court will construe contract as conditional if its "plain language" compels the court to do so); *Byler v. Great American Ins. Co.,* 395 F.2d 273, 276 (10th Cir.1968) (same); *see also* Restatement (Second) of Contracts, § 227, comment b ("When ... it is doubtful whether or not the agreement makes an event a condition of an obligor's duty, an interpretation is preferred that will reduce the risk of forfeiture"). Thus, where the contract language is unclear, an obligation should be interpreted as a promise, rather than a condition precedent. *See Castle,* 840 F.2d at 177; *see also Standard Oil Co. of California v. Perkins,* 347 F.2d 379, 383 (9th Cir.1965) ("a court will not imply that a covenant is a condition unless it clearly appears the parties so intended it"); Restatement (Second) of Contracts, § 227, comment d (there is a "preference for an interpretation that merely imposes a duty on the obligee to do the act and does not make the doing of the act a condition for the obligee's duty."). Here, the Settlement Agreement contains no language that even arguably makes Marsa's duty to cooperate in Metrobank litigation a condition precedent to Metrobank's duty to make payment. The contract language sets forth a list of mutual promises and no more. Indeed, the agreement expressly refers to the obligations undertaken by the parties as "mutual covenants and agreements." *See* Settlement Agreement, at 2.

That Marsa's duty to cooperate is not a condition precedent is confirmed by language in the Settlement Agreement which sets forth the remedies available for a breach of the agreement. The Settlement Agreement provides that in the event any party fails to comply with its obligations under the agreement, the other party may bring an action against the defaulting party to enforce performance under the agreement, as well as for actual damages caused by the default. Settlement Agreement, at 3, ¶ 6. The agreement does not provide that the other party is excused from performing. This is fully consistent with a finding that Marsa's duty to cooperate is a mere promise, rather than a condition precedent. *See Castle,* 840 F.2d at 177 ("Breach of a promise subjects the promisor to liability in damages, but does not necessarily excuse performance on the other side.") (*quoting* S. Williston, *A Treatise on the Law of Contracts,* § 665 (3d ed. 1960)).[7]

For these reasons, I find that Marsa's obligation to cooperate in litigation involving Metrobank is merely a promise under the Settlement Agreement and not a condition precedent to Metrobank's obligation to pay the entire amount of due under the agreement. Marsa's right to the payment therefore vested at the time he signed the agreement and resigned from Metrobank, and any purported termination of the Settlement Agreement pursuant to 12 C.F.R. § 563.-39(b)(5) cannot affect his right to payment.

I will now consider whether the RTC was authorized to repudiate the Settlement Agreement pursuant to 12 U.S.C. § 1821(e).

**C. 12 U.S.C. § 1821(e)**

 Section 212 of FIRREA authorizes a receiver or conservator of an insured depository institution to repudiate or disaffirm certain contracts.[8] *See* 12 U.S.C. § 1821(e). Specifically, 12 U.S.C. § 1821(e)(1) states in pertinent part:

> In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—
>
> (A) to which such institution is a party;
>
> (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
>
> (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

12 U.S.C. § 1821(e)(1).

Marsa argues that under 12 U.S.C. § 1821(e), the RTC may disaffirm or repudiate only executory contracts. The RTC argues, in turn, that the only limitations on its authority to repudiate a contract are those expressly set forth in 12 U.S.C. § 1821(e).

Although several courts have discussed the issue of whether 12 U.S.C. § 1821(e) applies to non-executory contracts, none has actually resolved the issue. *See, e.g., Gibson v. Resolution Trust Corporation,* 750 F.Supp. 1565, 1569 (S.D.Fla.1990) (declining to reach issue of whether receiver can repudiate non-executory contract); *Fresca,* 818 F.Supp. at 668 (same). In *Fresca,* however, Judge Sand of the Southern District of New York strongly suggested that Section 212 should be read to apply only to executory contracts. Judge Sand noted that on its face, Section 212 is not limited to executory contracts. However, Judge Sand examined the language of Section 212 and made the following observations:

---

**7.** Under the doctrine of constructive conditions of exchange, substantial performance of one party's obligations under a contract is deemed an implied condition to the other party's duty to perform under the contract. *See* E.A. Farnsworth, *Contracts,* § 8.9 (2d ed. 1990). The RTC has not argued that Marsa's duty to cooperate constitutes substantial performance under the contract, and I find as a matter of law, that the duty to cooperate is not substantial performance such that the failure to cooperate would excuse performance by the RTC.

**8.** This authority applies to the RTC by virtue of 12 U.S.C. § 1441a(b)(4). *See* 12 U.S.C. § 1441a(b)(4) (giving RTC "same powers and rights to carry out its duties" given to FDIC under 12 U.S.C. § 1821); *Rosa v. Resolution Trust Corporation,* 938 F.2d 383, 391 n. 10 (3d Cir.) (12 U.S.C. § 1821 is applicable to RTC by way of 12 U.S.C. § 1441a(b)(4)), *cert. denied,* — U.S. —, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991).

First, we note that the language of the statute, specifically the use of the terms "disaffirm" and "repudiate," is not without legal significance. Both terms suggest a stage of the contract where performance on the part of the [receiver] is not yet due. In other words, *repudiation entails an anticipatory breach, taking place before the triggering event occurs which would cause the other party's rights to vest.* Black's dictionary defines "disaffirm" as "to repudiate." Black's Law Dictionary 462 (6th Ed.1990). Black's defines repudiation of contracts: Repudiation of contract is in [the] nature of anticipatory breach before performance is due, but does not operate as anticipatory breach unless [the] promisee elects to treat repudiation as breach, and brings suit for damages. Such repudiation is but [an] act or [a] declaration in advance of any actual breach and consists usually of [an] absolute and unequivocal declaration or act amounting to [a] declaration on [the] part of [the] promisor to [the] promisee that he will not make performance on future day at which contract calls for performance. *Id.* at 1303.

*Id.* at 668. It appears, therefore, that a proper reading of Section 212 is that a receiver is precluded from disaffirming a non-executory contract. *See also First National Bank v. Unisys Finance Corp.,* 779 F.Supp. 85, 87 (N.D.Ill.1991) (stating, without further discussion, "12 U.S.C. § 1821(e) ... gives RTC the right to repudiate executory contracts."). To interpret Section 212 as applicable to non-executory contracts could yield "draconian" results. *See Fresca,* 818 F.Supp. at 668. However, this court also need not resolve this issue in order to dispose of the parties' motions. Even if the RTC could validly disaffirm the Settlement Agreement, Marsa would still be entitled to receive payment.

▮ Although FIRREA expressly permits a receiver to repudiate a contract, such repudiation is not without its consequences. The receiver is still liable for damages caused by the repudiation. 12 U.S.C. § 1821(e)(3); *Howell v. Federal Deposit Ins. Corp.,* 986 F.2d 569, 571 (1st Cir.1993) ("By repudiating the contract the receiver is freed from having to comply with the contract, ... but the repudiation is treated as a breach of contract that gives rise to an ordinary contract claim for damages, if any."). Specifically, a plaintiff may recover "actual direct compensatory damages," 12 U.S.C. § 1821(e)(3)(A)(i),[9] to be determined as of "the date of the appointment of the conservator or receiver." 12 U.S.C. § 1821(e)(3)(A)(ii)(I).

▮ Thus, a plaintiff may recover damages for accrued or existing obligations as of the date of the appointment. In contrast, a receiver is not liable for future or contingent obligations. *Compare Pioneer Bank & Trust Co. v. Resolution Trust Corp.,* 793 F.Supp. 828, 831 (N.D.Ill.1992) (FIRREA does not limit liability for accrued lease obligations); *Unisys,* 779 F.Supp. at 87 (recovery limited to unpaid back rent); *with Office & Professional Employees Int'l Union, Local 2 v. Federal Deposit Ins. Corp.,* 813 F.Supp. 39, 45 (D.D.C.1993) (claims for severance payment denied where rights to severance had not yet vested at time of appointment); *Bayshore Executive Plaza Partnership v. Federal Deposit Ins. Corp.,* 750 F.Supp. 507, 510–11 (S.D.Fla.1990) (future rent not recoverable under repudiated lease), *aff'd,* 943 F.2d 1290 (11th Cir.1991); *see also* 12 C.F.R. § 563.39(b)(5) (rights vested under employment contract not impaired by termination of contract); *Fresca,* 818 F.Supp. at 667 (interpreting 12 U.S.C. § 1821(e) as permitting disaffirmance of vested rights would constitute "draconian" reading of statute).

▮ Such a result is confirmed by both the legislative history and federal common law. For example, the "legislative history reflects Congress' intent to shield a receiver from damages incurred *because* of a contract or lease repudiation, but not from damages for existing obligations." *Pioneer Bank,* 793

9. The term "actual direct compensatory damages" is defined not to include "(i) punitive or exemplary damages; (ii) damages for lost profits

F.Supp. at 831. Under federal common law,[10] the rights and liabilities of a bank and the bank's debtors and creditors are unconditionally fixed at the time of the declaration of the bank's insolvency. *American National Bank of Jacksonville v. Federal Deposit Ins. Corp.,* 710 F.2d 1528, 1540 (11th Cir.1983); *Federal Deposit Ins. Corp. v. Grella,* 553 F.2d 258, 262 (2d Cir.1977); *Bayshore,* 750 F.Supp. at 511. Thus, under federal common law, to establish a claim against an insolvent bank in receivership, the bank's liability must have accrued and become unconditionally fixed on or before the time the bank was declared insolvent. *Dababneh v. Federal Deposit Ins. Corp.,* 971 F.2d 428, 434 (10th Cir.1992) (*quoting Kennedy v. Boston–Continental Nat'l Bank,* 84 F.2d 592, 596 (1st Cir.1936)).

 Here, at the time the RTC was appointed, Marsa had already resigned from Metrobank pursuant to the terms of the Settlement Agreement and his rights to payment pursuant to the terms of the Settlement Agreement had already vested. Thus, the RTC is liable to Marsa for damages in the amount of the accrued benefits under the Settlement Agreement.[11]

For these reasons, I find that Marsa is entitled to the $400,000 still owing under the Settlement Agreement.[12]

### Conclusion

For all the foregoing reasons, Marsa's motion for summary judgment is granted and

or opportunity; or (iii) damages for pain and suffering." 12 U.S.C. § 1821(e)(3)(B).

**10.** 12 U.S.C. § 1821(c) is a codification of both federal and state common law. *Bayshore,* 750 F.Supp. at 509.

**11.** With regard to Marsa's claim for attorneys' fees and costs under the Settlement Agreement, I find that Marsa is entitled to recover those fees and costs incurred up until the date the RTC was appointed receiver. As discussed above, the RTC is liable for damages under 12 U.S.C. § 1821(e)(3) for accrued or existing obligations, measured as of the date of the appointment. The RTC is not liable for future or contingent damages. Thus, any attorneys' fees or costs incurred

the RTC's motion for summary judgment is denied.

after the date the RTC was appointed receiver constitute future damages and are, therefore, not recoverable under 12 U.S.C. § 1821(e)(3)(A)(ii)(I) and the caselaw cited above.

I trust that the parties will be able to agree on an appropriate amount of fees. If, however, the parties are unable to do so, Marsa may make an application before the court in accordance with Rule 46 of the General Rules for the District of New Jersey.

**12.** In light of this disposition, I need not consider Marsa's remaining arguments that the RTC failed to properly exercise its discretion in disaffirming the Settlement Agreement and that the RTC's Managing Agent for Metrobank lacked authority to disavow the Settlement Agreement.