**RESOLUTION TRUST CORPORATION, as Receiver for Occidental Nebraska Savings Bank, F.S.B., Appellee,**

v.

**MANAGEMENT, INC., Appellant.**

No. 93–2252.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1994.

Decided May 25, 1994.

Daniel J. Duffy, Omaha, NE, argued (Terry J. Grennan, on the brief), for appellant.

Craig A. Knickrehm, Omaha, NE, argued (Todd Griffee, Overland Park, KS and Karen Caplan, Washington, D.C., on the brief), for appellee.

Before BOWMAN and WOLLMAN, Circuit Judges and ALSOP,* Senior District Judge.

* The HONORABLE DONALD D. ALSOP, Senior United States District Judge for the District of

ALSOP, Senior District Judge.

The Resolution Trust Corporation (the "RTC") brought this action to recover funds it alleges are wrongfully being withheld by Management, Inc. ("Management"). Management counterclaimed, arguing that it is entitled to the disputed funds under the terms of a real estate management agreement. At the close of a two-day jury trial, the district court[1] granted the RTC's motion for judgment as a matter of law and dismissed the jury. Management appeals. We affirm.

## I. BACKGROUND

The RTC sued as the receiver of Occidental Nebraska Savings Bank, F.S.B., which, in turn, was the successor of Occidental Nebraska Federal Savings Bank (collectively, "Occidental"). On July 1, 1987, Occidental and Management entered into a real estate management agreement (the "Agreement") relating to a commercial real estate project in Omaha, Nebraska (the "Property"). Under the terms of the Agreement, Management agreed to "supervise and direct" the "management, leasing and operation" of the Property. The Agreement ran from July 1, 1987 through January 1, 1990 and provided for optional, one-year terms of renewal.

On June 22, 1990, Occidental was declared insolvent, and the RTC was appointed as receiver. Shortly thereafter, the RTC decided to repudiate the Agreement. Dale Kennedy, an RTC real estate manager, was chiefly responsible for this decision. Kennedy concluded that real estate management services were available from other companies at more favorable terms and better rates. Therefore, Kennedy decided that the Agreement was burdensome to the receivership estate and that repudiation of the Agreement would promote the orderly administration of Occidental's affairs. On September 30, 1990, the RTC repudiated the Agreement pursuant to section 212 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1821(e), by

written notice from Kennedy to Edwin Schoening, Management's president.

In his notice of repudiation, Kennedy informed Management that, under FIRREA, the RTC was liable for only limited damages stemming from the repudiation. Kennedy further stated that any claim for damages should be submitted for administrative review. Management responded by letter dated November 20, 1990, from Vice President Terrance Hogan. In his letter, Hogan itemized $224,792.79 in "management fees," which Management claimed under the terms of the Agreement. Management paid itself this sum out of the rents it had collected under the Agreement and refused to turn over these proceeds to the RTC.

On November 29, 1990, Management submitted an administrative claim to the RTC for a "disaffirmed contract deferred management fee" of $22,615.81, and a "disaffirmed contract development fee" of $200,000. The RTC allowed the $22,615.81 claim for deferred management fees and a separate $2,176.98 claim for current October management fees. The RTC disallowed the $200,000 claim for development fees. This disallowed claim is the subject of the parties' current dispute. Management claims it is entitled to the remaining $200,000 as a "remarketing fee" or "redevelopment fee" under the terms of the Agreement. The RTC contends that it is entitled to the remaining $200,000 because payment of $24,792.79 fully satisfied its obligations to Management.

Management bases its claim on Article 3 of the Agreement, which reads in part as follows:

The initial term of this Agreement shall commence upon the execution of this agreement and shall continue until January 1, 1990.

The parties shall have the option to renew this Agreement for additional terms of one (1) year increments by mutual agreement. The first term of renewal shall commence on the expiration of the initial term, and the subsequent renewal term, if any, shall commence on the expiration of

Minnesota, sitting by designation.

1. The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

the previous renewal term. Renewal will be automatic unless notice to the contrary is given by either party....

If notice of intent not to renew is given by Manager or Manager is released (at Manager's request) from this Agreement prior to first renewal date by Owner, Manager's compensation will be computed per Article 11. The Manager's compensation shall be the amount of "Deferred Fees" if the first option to renew is declined and will be the "Deferred Fees" and Incentive Fees for any subsequent option to renew which is declined.

If notice of intent not to renew is given by Owner, Manager's compensation will be computed as per Article 11. Manager's compensation shall be the amount of "Deferred Fees" plus the sum of $150,000.00 if the first option to renew is declined and will be the "Deferred Fees" and Incentive Fees plus the sum of $200,000.00 for any subsequent option to renew which is declined.

Deferred Fees are defined in Article 11 as a percentage of leasing fees and gross revenue collected prior to January 1, 1990. Incentive Fees are defined as a percentage of "net cash flow" beginning January 1, 1991. Neither Deferred Fees nor Incentive Fees are at issue in this dispute. Article 11 does not explain or reference the $150,000 or $200,000 fee described in Article 3 (the "Article 3 Fee").

Management argues that the RTC's repudiation of the Agreement constituted a notice of non-renewal under Article 3. Because this purported notice came during the first renewal period and after the initial term had expired, Management argues that it is entitled to $200,000. Alternatively, Management argues that it is entitled to $150,000 and a pro-rated share of the remaining $50,000 for the work it did through June 22, 1990, when the RTC was appointed as Occidental's receiver.

This dispute came on for trial on April 20, 1993. At trial, the district court excluded all extrinsic evidence relating to the meaning of the terms of the Agreement. At the close of trial, the district court concluded that, as a matter of law, Management is not entitled to the Article 3 Fee because the RTC's repudiation was not the equivalent of a notice of non-renewal. The district court further concluded that any damages stemming from Management's loss of the Article 3 Fee are not compensable under FIRREA. Accordingly, the district court entered judgment for the RTC as a matter of law.

On appeal, Management argues that the district court improperly excluded extrinsic evidence regarding the meaning of the Agreement, misconstrued the Agreement as a matter of law, erroneously concluded that its loss of the Article 3 Fee does not constitute compensable damages, and failed to recognize the security interest it possesses in the disputed funds.

## II. ANALYSIS

 As a preliminary matter, we first address Management's contention that the district court erred by excluding from trial all extrinsic evidence relating to the meaning of the terms of the Agreement. Management argues that extrinsic evidence should have been admitted to allow the jury to properly understand the parties' interpretation of the terms of the Agreement. This argument is foreclosed by Management's admission that the Agreement is unambiguous. When a contract is unambiguous, "the intent of the parties must be gathered from the contents of the document alone." *Delicious Foods Co., Inc. v. Millard Warehouse, Inc.*, 244 Neb. 449, 507 N.W.2d 631, 639 (1993) (per curiam); *accord Krzycki v. Genoa Nat'l Bank*, 242 Neb. 819, 496 N.W.2d 916, 921 (1993).[2] Therefore, extrinsic evidence was not admissible for the purpose of explaining the meaning of the Agreement. *See Krzycki*, 496 N.W.2d at 921; *Rumbaugh v. Rum-*

---

**2.** The Agreement contains a Nebraska choice-of-law clause in Article 21, and the parties both cite Nebraska law as governing the interpretation of the Agreement. Therefore, we assume, without deciding, that Nebraska law is applicable. We note, however, that other courts have concluded that federal common law governs this type of claim. *See, e.g., Modzelewski v. RTC*, 14 F.3d 1374, 1379 (9th Cir.1994); *Dababneh v. FDIC*, 971 F.2d 428, 433 (10th Cir.1992); *Crocker v. RTC*, 839 F.Supp. 1291, 1294 (N.D.Ill.1993).

*baugh,* 229 Neb. 652, 428 N.W.2d 500, 502 (1988). The district court properly excluded this evidence from trial and construed the Agreement as a matter of law.

We turn now to Management's claim for the $200,000 Article 3 Fee. To prevail on this claim, Management must show, first, that it is contractually entitled to the Article 3 Fee under the terms of the Agreement and, second, that loss of the Article 3 Fee constitutes compensable damages under FIRREA. We address each of these issues separately.

■ Management argues that it is entitled to the Article 3 Fee under the terms of the Agreement because the RTC's repudiation was the functional and legal equivalent of a "notice of intent not to renew" under Article 3. Therefore, Management argues, the RTC's repudiation triggered its obligation to pay the Article 3 Fee. The district court rejected this argument, stating that:

> The event which terminated the Agreement was not the result of a specific "declined option to renew," or any of the other specified events in the Agreement (such as sale, termination or condemnation), but was the result of a series of wholly unanticipated events untreated in the Agreement, specifically, the insolvency of Occidental, its cessation of existence, passage of FIRREA, creation of the RTC by FIRREA, the congressional grant to the RTC of the repudiation power in 12 U.S.C. § 1821(e) of FIRREA, and [the] RTC's repudiation.

(Slip op. at 10.) Because the Agreement was not terminated by a notice of non-renewal, the district court concluded that Management was not entitled to the Article 3 Fee.

We agree that the RTC's repudiation of the Agreement did not constitute a notice of non-renewal under Article 3. The RTC could have, had it wished, continued to operate under the terms of the Agreement for the remainder of the one-year renewal period and then given Management notice of its intent not to renew. Had the RTC chosen this course, Management would have been contractually entitled to the Article 3 Fee. However, the RTC simply repudiated the Agreement. The authority and the decision

to repudiate were separate from and in no way dependent on the system of one-year automatic renewals established by the Agreement.

Furthermore, we note that repudiation is normally "treated as a breach of contract that gives rise to an ordinary contract claim for damages." *Howell v. FDIC,* 986 F.2d 569, 571 (1st Cir.1993). The Agreement specifically contemplates a termination by breach in Article 15(2) and provides for "liquidated damages" in the event of a termination by breach in Article 22. Therefore, the Agreement provides no basis for equating the RTC's repudiation with an Article 3 notice of non-renewal. The district court properly concluded that Management is not entitled to the Article 3 Fee under the terms of the Agreement.

Management also argues that the district court erroneously concluded that its loss of the Article 3 Fee is not compensable under FIRREA. The district court concluded that, regardless of whether Management has any contractual entitlement to the Article 3 Fee, damages stemming from Management's loss of the Article 3 Fee are not compensable because they are not "actual direct compensatory damages." 12 U.S.C. § 1821(e)(3)(A)(i).

■ The RTC, in its capacity as a receiver, is empowered by FIRREA to "disaffirm or repudiate" any contract it "determines to be burdensome" and inconsistent with "the orderly administration of the institution's affairs." 12 U.S.C. § 1821(e)(1). By repudiating a contract, the RTC is freed from any duty of compliance. *Howell,* 986 F.2d at 571. The RTC's liability for damages resulting from the repudiation is "limited to actual direct compensatory damages," 12 U.S.C. § 1821(e)(3)(A)(i), which are "determined as of the date of the appointment of the ... receiver," 12 U.S.C. § 1821(e)(3)(A)(ii)(I). Specifically excluded from the definition of "actual direct compensatory damages" are "damages for lost profits or opportunity." 12 U.S.C. § 1821(e)(3)(B)(ii).

■ Management argues that the $200,000 Article 3 Fee represents deferred compensa-

tion for its "redevelopment" or "remarketing" efforts with the Property. Therefore, Management argues, the Article 3 Fee qualifies as "actual direct compensatory damages." We conclude, as did the district court, that "no fair reading of the Agreement, and particularly Article 3, permits the conclusion that the fees are payment for services rendered in the past." (Slip op. at 12–13.)

Article 3 provides for automatic one-year renewals of the Agreement, unless either party gives notice of non-renewal. Article 3 is also structured so that Management's entitlement to the Article 3 Fee is contingent on which party gives notice of non-renewal. If Management had given notice of non-renewal, then it would be entitled to only Deferred Fees and Incentive Fees. If, however, Occidental had given notice of non-renewal, then Management would be entitled to Deferred Fees, Incentive Fees, and the Article 3 Fee. Therefore, Management would receive the Article 3 Fee only if Occidental had decided to terminate the Agreement by notice of non-renewal. Management would not be entitled to the Article 3 Fee if it had terminated the Agreement itself or if the Agreement had been terminated by some means other than notice of non-renewal.

The structure of Article 3 illustrates the true nature of the Article 3 Fee. As the district court found, the Article 3 Fee is a severance penalty designed to dissuade Occidental from terminating Management's opportunity to continue managing and marketing the Property. Alternatively, the Article 3 Fee could be characterized as a liquidated damage clause for future lost profits. Neither severance fees nor future lost profits are compensable under FIRREA. *See* 12 U.S.C. § 1821(e)(3); *Lawson v. FDIC*, 3 F.3d 11, 15–16 (1st Cir.1993); *Howell*, 986 F.2d at 573. Therefore, the district court properly concluded that damages stemming from the loss of the Article 3 Fee are not compensable under FIRREA.[3]

Finally, we reject Management's claim that the district court failed to properly recognize its secured status with respect to the disputed funds. Management argues that it was granted a security interest under the terms of the Agreement and also that it has a possessory lien in the disputed funds. Under the terms of FIRREA, security interests are not avoidable "except where such an interest is taken in contemplation of the institution's insolvency or with the intent to hinder, delay, or defraud the institution." 12 U.S.C. § 1821(e)(11).

■ Article 11 of the Agreement secures payment of the Deferred Fees by granting Management "a lien against the Premises" until the Deferred Fees are paid. Management, however, is claiming a security interest in collected rents, not the Property. Furthermore, because Management has been paid its Deferred Fees, the security interest granted in Article 11 is terminated and 12 U.S.C. 1821(e)(11) becomes inapplicable. *See Unisys Fin. Corp. v. RTC*, 979 F.2d 609, 611–12 (7th Cir.1992); *Fleet Nat'l Bank v. FDIC*, 843 F.Supp. 787, 790–91 (D.Mass. 1994).

Management's claim of a possessory lien also fails because Management offers no evidence of an agreement granting it a security interest in the disputed funds. Likewise, Management does not suggest that the law grants it any type of possessory lien. *See, e.g.*, Neb.Rev.Stat. §§ 52–131 (construction lien); 52–201 (artisan's lien); 52–301 (jeweler's lien). Therefore, the district court properly concluded that Management has no security interest in the disputed funds.

### III. CONCLUSION

Having examined the arguments raised by the appellant and finding no error, we affirm the judgment of the district court.

---

3. Because we conclude that Management has no contractual entitlement to the Article 3 Fee and that damages stemming from the loss of the Article 3 Fee are not "actual direct compensatory damages," we need not address whether Management's claim for the Article 3 Fee was "determined" as of June 22, 1990, when the RTC was

appointed receiver. *See* 12 U.S.C. § 1821(e)(3)(A)(ii)(I); *Nashville Lodging Co. v. RTC*, 839 F.Supp. 58, 62 (D.D.C.1993); *Citibank (South Dakota) v. FDIC*, 827 F.Supp. 789, 791 (D.D.C.1993); *cf. Dababneh v. FDIC*, 971 F.2d 428, 434–35 (10th Cir.1992) (applying federal common law).