USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-2429 MARY E. LAWSON AND MATT LAWSON, Plaintiffs, Appellants, v. FEDERAL DEPOSIT INSURANCE CORPORATION, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________ ____________________ Before Torruella, Cyr and Boudin, Circuit Judges. ______________ ____________________ Edward T. Joyce with whom Deborah I. Prawiec, Raymond A. Fylstra, _______________ ___________________ __________________ Joyce and Kubasiak, P.C., William D. Robitzek, David G. Webbert and ________________________ ____________________ _________________ Berman and Simmons, P.A. were on brief for appellants. _______________________ Jerome A. Madden, Counsel, Federal Deposit Insurance Corporation, ________________ with whom Ann S. DuRoss, Assistant General Counsel, Federal Deposit _____________ Insurance Corporation, and Richard J. Osterman, Jr., Senior Counsel, ________________________ Federal Deposit Insurance Corporation, were on brief for appellee, Federal Deposit Insurance Corporation. Roy S. McCandless with whom P. Benjamin Zuckerman, Patricia ___________________ _______________________ ________ Nelson-Reade and Verrill & Dana were on brief for appellee, Fleet Bank ____________ ______________ of Maine. ____________________ August 23, 1993 ____________________ BOUDIN, Circuit Judge. The facts of this case are ______________ straightforward. In January 1991, plaintiffs Mary and Matt Lawson purchased five one-year certificates of deposit ("CDs") from the Maine Savings Bank, representing a deposit payment in each case of approximately $92,000. Each CD had an interest rate of 7.9 percent per year, giving the CDs a maturity value of $100,000 each. A CD reflects a deposit coupled with an agreement by the depositor to leave the funds in the bank for a fixed period. It appears that Maine Savings Bank was in financial difficulty when the CDs were sold to the Lawsons and that the interest rate offered was a favorable one. Maine Savings Bank was declared insolvent on February 1, 1991, and the Federal Deposit Insurance Corporation was appointed receiver. As it often does, the FDIC transferred certain accounts to a healthy bank, in this case defendant Fleet Bank of Maine.1 The accounts transferred in this case included deposit accounts such as the Lawsons' CDs. The purchase and assumption agreement between Fleet Bank and the FDIC authorized Fleet Bank to reduce the interest rates paid on the transferred accounts after fourteen days, provided that the reduced rates did not go below the rate customarily ____________________ 1The FDIC has authority to "transfer any asset or liability of the institution in default" to a healthy financial institution, "without any approval, assignment, or consent with respect to such transfer." 12 U.S.C. 1821(d)(2)(G). -2- -2- paid by Fleet Bank on passbook savings accounts and provided that the depositors were given the opportunity to withdraw the funds without penalty. On February 13, 1991, Fleet Bank notified the Lawsons that it had accepted Maine Savings' deposit accounts and would honor the original interest terms on the CDs until February 22, but thereafter would reduce the interest rates pursuant to a schedule enclosed with the notice. The notice gave the Lawsons the option of withdrawing their deposits without penalty, or maintaining the accounts at the lower rate. The Lawsons elected to withdraw the funds and bring this suit in Maine state court against Fleet Bank for breach of contract, denominating it a class action. Fleet Bank then impleaded the FDIC, and the FDIC removed the action to federal court. The Lawsons completed the cycle by filing their own suit against the FDIC, which was then consolidated with the removed suit against Fleet Bank. The district court granted Fleet Bank's motion for summary judgment on the ground that the purchase and assumption agreement authorized Fleet Bank to reduce the interest rate. It also granted the FDIC's motion to dismiss, holding that the FDIC was not liable to the Lawsons for more than the deposits and accrued interest, which Fleet Bank had already paid. The Lawsons then took this appeal. We -3- -3- consider first the claim against the FDIC and then that against FleetBank, and we affirmthe district courtas to both. The FDIC is best known in its "corporate" role as the statutory insurer of funds deposited in federally insured financial institutions, generally up to $100,000 per account. See 12 U.S.C. 1821(a). The FDIC may also be appointed to ___ take over the operations of a failed institution, acting as receiver or conservator depending on the functions that it has been assigned. See id. 1821(c). The powers and ___ __ liabilities of the FDIC, enlarged substantially by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, differ in the FDIC's various manifestations, such as insurer and receiver, and must be considered separately. As insurer, the FDIC was required by statute to guarantee the Lawsons' "insured deposits," either by paying them in cash or "by making available to each depositor a transferred deposit in a new insured depository institution . . . in an amount equal to the insured deposit of such depositor." Id. 1821(f)(1).2 A "deposit," in turn, is __ defined generally as "the unpaid balance of money or its equivalent received or held by a bank or savings association ____________________ 2Each of the CDs was treated as a separately insured account; even though the total exceeds the $100,000 limitation, it appears that the regulations permitted this arrangement. -4- -4- in the usual course of business . . . ." Id. 1813(l)(1). __ The statute allows the FDIC to define the term further by regulation. Id. 1813(l)(5). Pertinent FDIC regulations __ fix the amount of an "insured deposit" as the balance of principal and interest unconditionally credited to the deposit account as of the date of default of the insured depository institution, plus the ascertainable amount of interest to that date, accrued at the contract rate . . ., which the insured depository institution in default would have paid if the deposit had matured on that date and the insured depository institution had not failed. 12 C.F.R. 330.3(i)(1). Here, the FDIC as insurer complied with the statute and regulations by transferring the Lawsons' deposit accounts to Fleet Bank, which in turn made available to the Lawsons the principal plus interest that had accrued at the contract rate up to February 22, 1991. This was actually a step beyond the agency's legal obligation as insurer, since it was obliged to pay accrued interest only to the date of Maine Savings Bank's default. Thus the FDIC more than satisfied its duty as insurer. The Lawsons do not appear to claim that they were short-changed under the insurance provisions. Instead, they argue that the FDIC is liable as the inheritor of the contractual obligations of the Maine Savings Bank, that is, as the receiver for the failed bank.3 ____________________ 3Their brief is somewhat confusing on this point because, while they do not claim any default in insurance coverage, they argue that the FDIC is liable both in its -5- -5- In resolving this claim, the district court, at FDIC's urging, relied upon 12 U.S.C. 1821(i)(2), and the FDIC reasserts that statutory defense in this court. That provision imposes a ceiling on FDIC liability as to most creditor claims against the FDIC "as receiver or in any other capacity" where a bank has failed. Broadly, the FDIC's maximum liability is the amount that the creditor would have received if the institution had been liquidated outright. The district court said that "[a]s already demonstrated above," the Lawsons in liquidation would have received their original deposit plus interest at the contract rate only to the date Maine Savings became insolvent.4 It is a miracle that anyone, let alone a busy district judge, can cope with the profusion of arguments that the FDIC and Resolution Trust Corporation unleash in cases of this kind. To some extent they reflect the complexity of the statutory provisions but, after seeing a number of these cases, one may come to believe that the agencies' litigating ____________________ corporate capacity and in its receiver capacity. The former capacity, however, here corresponds to the FDIC's role as insurer; the FDIC's inheritance of the CD contracts and their obligations was as receiver. 4The Lawsons point out that section 1821(i) as a whole applies only to "the rights of the creditors (other than insured depositors)." Id. 1821(i)(1). While the Lawsons ___ are indeed "insured depositors," it is quite likely (we need not resolve the issue) that the parenthetical on which they rely is meant to reserve the rights of insured depositors to __ their insurance protection and not to other claims that they ___________________________ may have. -6- -6- style has some role in the confusion. Like a giant squid releasing ink, agency counsel pour out arguments and citations, heaping defense upon defense, sometimes without heed for the merits of the contention. It is not clear that this approach serves the long-run interests of bank regulators who have a stake in coherent and consistent interpretation by the courts. In all events, we think that the FDIC in this instance led the district court astray. There is no indication in its opinion of any evidence that, had the Maine Savings Bank been liquidated and the assets allocated among creditors, the assets would have been inadequate to pay the Lawsons a portion of the future interest they now claim. On appeal, the FDIC's brief tells us that the creditors will receive only about 77 cents on the dollar; but that information fails to show that the Lawsons would have received nothing on their future interest claims in liquidation and it may even suggest that they might have received something. Section 1821(i)(2) could cut off the Lawsons' entire claim for future interest only if it were shown that, in liquidation, there would be no __ money available even for partial payment of that claim.5 ____________________ 5The FDIC has made a separate argument that, even if the assets were sufficient to pay the Lawsons for future interest, nineteenth century case law provides a basis for cutting off future interest obligations to depositors of a failed bank as of the date of insolvency. See White v. Knox, ___ _____________ 111 U.S. 784 (1884). The status of this line of authority, and its application to a fixed interest/fixed period CD -7- -7- It appears that the district court had in mind its prior discussion in its opinion which shows, by analysis that we have condensed in our own earlier discussion, that the FDIC's insurance obligations were limited to returning to the _________ Lawsons their deposits with accrued interest. But Maine Savings Bank's obligations to the Lawsons were broader: they included the payment of future interest, at the contract rate, for the entire one-year period. The FDIC inherited the obligation to pay that future interest when it became receiver. The damages might be mitigated once the Lawsons recovered their deposit and could relend the money; but some loss would still be suffered to the extent that the current interest rate fell below the favorable rate promised by Maine Savings Bank. Nevertheless, we believe that the FDIC as receiver is not liable for this differential on future interest between the market rate and the apparently greater rate promised by Maine Savings Bank. As we recently explained in Howell v. _________ FDIC, 986 F.2d 569, 571 (1st Cir 1993), FIRREA gives the FDIC ____ as receiver the right to disaffirm or repudiate contracts that the bank entered into prior to receivership if the FDIC decides "in its discretion" that performance will be burdensome and that disavowal will promote the orderly ____________________ contract, need not be resolved in this case. -8- -8- administration of the failed bank's affairs. 12 U.S.C. 1821(e)(1).6 The Lawsons argue that if a repudiation occurred, it was not done by the FDIC but by Fleet Bank, and that the statute does not allow such a delegation of repudiation authority. This argument has some surface appeal since the statute authorizes "a conservator or receiver" to repudiate contracts, id., and says nothing about the delegation of this __ function or its performance by one to whom a contract is assigned. We need not pursue this interesting question because we believe that the purchase and assumption agreement was in substance a repudiation of the CD contracts by the _______ FDIC. ____ While the FDIC might have attempted to substitute Fleet Bank for Maine Savings Bank as obligor under the CD contracts, that is not what the FDIC did here. As we explain below, the purchase and assumption agreement did not commit Fleet Bank to the prior CD contracts including their interest rate obligations. Rather, Fleet Bank agreed with the FDIC to ____________________ 6The Lawsons argue that some courts have found that the FDIC's repudiation authority under FIRREA is limited to executory contracts, that is, contracts in which performance is still due from both sides. See, e.g., First Nat'l Bank v. ___ ____ ___________________ Unisys Fin. Corp., 779 F. Supp. 85, 86-87 (N.D. Ill. 1991), _________________ aff'd on other grounds, 979 F.2d 609 (7th Cir. 1992). The _______________________ contracts here were executory: at the time of repudiation, the bank was still performing its promise to continue paying interest, and the Lawsons were performing their ongoing obligation to keep their funds on deposit. -9- -9- repay only the deposit and accrued interest or, if the _______ depositor agreed, to continue holding the deposit but at an interest rate determined by Fleet Bank. In other words, the FDIC did not transfer the Lawsons' CD contracts intact to a new obligor; it effectively repudiated those contracts when __________ it declined either to pay the promised interest itself or to oblige anyone else to do so. The repudiation may have been informal but there was certainly no ambiguity; the notice to the Lawsons from Fleet Bank, describing the transfer of the deposits and the commitments made to the FDIC, was clear notice that the original interest rate would no longer be paid.7 The Lawsons contend that the FDIC, in violation of Maine contract law, improperly "split" the CD contracts into principal and interest components and attempted to transfer one obligation without the other. The transfer of the deposits to Fleet Bank was expressly authorized by federal statute and was in that sense a lawful federal act. At the same time, it was a repudiation and breach of the contracts ____________________ 7The FDIC, both in its papers rejecting the Lawsons' administrative claim and in its brief to us, cites and relies upon 12 U.S.C. 1821(e)(3)(A), which is pertinent only on the assumption that the contracts were repudiated. At the same time, it denied in its district court papers that it ever "formally" repudiated the CD contracts. It is understandable that the word "repudiation" is unattractive to the FDIC in the transfer of depositor accounts; but the FDIC's desire to maintain depositor confidence does not alter the substance of what it has done, namely, to refuse to maintain the promised interest rate. -10- -10- represented by the CDs since the FDIC, which had inherited the contracts, effectively declined to pay the promised interest in the future or commit Fleet Bank to do so. Whether called "improper splitting" or something else, the outcome is the same: Fleet Bank is bound only by what it promised the FDIC, but the FDIC as receiver is left with a contract claim against it. This does not end the matter. As we have explained in Howell, FIRREA does not always permit the FDIC to repudiate ______ contracts without consequence; rather, the repudiation gives rise to an ordinary claim for breach of contract. Howell, ______ 986 F.2d at 571. The types of damages that may be recovered in such a suit against the FDIC, however, are sharply limited by the statute to "actual direct compensatory damages" calculated as of the date of the appointment of the receiver. 12 U.S.C. 1821(e)(3)(A). Damages for "lost profits or opportunities" are specifically excluded. Id. __ 1821(e)(3)(B). This provision precludes the Lawsons' recovery of future interest from the FDIC. Although the phrase "actual direct compensatory damages" may not be self-executing, the prohibition on recovery of "lost profits or opportunities" does fit the situation like a glove. After all, the Lawsons have recovered immediate use of their money, just as if they were owners of a house whose tenant had departed without completing his lease. The money -11- -11- can be reloaned at current interest rates, just as the house can be re-rented at current rental rates. What has been lost is the chance to earn even more than the current "rental" value of the property, whether the property is a sum of money or a vacant house. If current interest rates are below the favorable rate promised by Maine Savings Bank, obviously the Lawsons are worse off getting back their deposit and accrued interest than they would have been if the CD commitments had been fulfilled. But it was evidently Congress' intent, in a situation where the failed bank is likely to have fewer assets than debts, to spread the pain by placing a limit on what can be recovered under a repudiated contract. The barring of above-market interest for the period after the money has been returned to the depositor is surely what Congress had in mind when it barred lost profits or opportunities. This is not mere speculation. Leases are commonly repudiated by bankrupt estates and in FIRREA Congress--in addition to the general limitation on damages--made special provision for computing damages for such leases. Where the failed bank has rented property from another and the receiver seeks to repudiate the lease and return the property, the statute permits recovery of unpaid rent for past occupancy but no recovery for future rent or damages under any -12- -12- acceleration clause or other penalty provision. Id. __ 1821(e)(4). Comparably, the Lawsons get paid interest for past use of their money but there is no recovery for future interest. For the sake of completeness, we note that the FDIC--in addition to its many other defenses--urges one additional defense against the contractual claim made against it as receiver. This argument relies upon 12 U.S.C. 1821(g), which provides that when the FDIC has paid an insurance claim to a depositor or arranged for a healthy insured bank to take over the deposit, then the FDIC in its corporate capacity is subrogated to--i.e., takes over--the depositor's claims ____ against the failed bank that it has just paid. There is nothing surprising in this provision; it merely allows the FDIC as insurer to share in whatever assets (held custodially by the FDIC as receiver) may be left over for creditors. What is surprising is that the FDIC here asserts that this subrogation provision transfers to the FDIC in its corporate capacity not merely the Lawsons' claim for what they got as a result of the Fleet Bank's actions (the deposits plus accrued interest) but the Lawsons' entire claim including their contractual right to future interest at the favorable rate. At first glance this seems at odds not only with common sense but also with the statute, which subrogates the FDIC "to all rights of the depositor against such -13- -13- institution or branch to the extent of such payment [by the _______________________________________ FDIC] or assumption [by a healthy bank]." Id. 1821(g)(1) ________________________________________ __ (emphasis added). Suffice it to say, the "lost profits and opportunities" bar is a readier answer to the Lawsons' claim. Turning finally to the claim against Fleet Bank, it did not assume any obligations with respect to the Lawsons' deposit accounts beyond those set forth in the purchase and assumption agreement. See Payne v. Security Savings & Loan ___ __________________________________ Ass'n, 924 F.2d 109, 111 (7th Cir. 1991). Thus, if the _____ bank's conduct was consistent with the agreement, as the district court found, the Lawsons have no case. We agree with the district court. Some analysis of the terms of the agreement is necessary to make the point, but not much. Section 2.2 of the Agreement provides as follows: 2.2 Interest on Deposit Liabilities Assumed. The ________________________________________ Assuming Bank [i.e., Fleet Bank] agrees that, from ____ and after Bank Closing, it will accrue and pay interest on Deposit Liabilities assumed pursuant to 2.1 and in accordance with the terms of the respective deposit agreements between the Failed Bank [Maine Savings] and the depositors of the Failed Bank for a period of fourteen (14) days commencing the day after Bank Closing. Thereafter, the Assuming Bank may pay interest with respect to such Deposit liabilities at rate(s) it shall determine; provided, that such rate(s) shall not be ________ ____ less than the rate of interest the Assuming Bank pays with respect to passbook savings Deposit accounts. The Assuming Bank shall permit each such depositor to withdraw, without penalty for early withdrawal, all or any portion of such depositor's Deposit . . . . The Assuming Bank shall give notice to such depositors . . . of interest which it has determined to pay after such fourteen (14)- day period, and of such withdrawal rights. -14- -14- Faced with this clear language ("at rate(s) it shall determine"), the Lawsons say that section 2.2 merely provides that Fleet Bank "may" reduce interest rates after fourteen days, and that this language "stops short of the explicit authorization to reduce interest rates that Fleet Bank and the District Court say it is." And, they say that if the language were construed to grant such authority, it would conflict with Fleet Bank's promise in section 5.2 to "honor the terms and conditions of each written agreement with respect to each Deposit Account transferred." Courts are often called upon to interpret opaque contractual provisions but construing section 2.2 is a walk in the park: it authorizes Fleet Bank to reduce the interest rate after fourteen days. As to the supposed inconsistency with section 5.2, it is a familiar precept of contract interpretation that the specific controls the general, and section 2.2's specific authorization to reduce rates trumps the general promise to "honor the terms and conditions of the contract." But the precept is unnecessary here: the paragraph on which the Lawsons rely (section 5.2) begins with the caveat, "Subject to the provisions of Section 2.2 . . . ." Affirmed. ________ -15- -15-