August 16, 1994 UNITED STATES COURT OF APPEALS
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-2145

DPJ COMPANY LIMITED PARTNERSHIP,

Plaintiff, Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,
AS RECEIVER FOR BANK OF NEW ENGLAND, N.A.,

Defendant, Appellee.

ERRATA SHEET

The opinion of this court issued on July 27, 1994, is amended as
follows:

On page 7, footnote 1, line 3, change "Cobblestone" to

"Cobblestone".

On page 8, paragraph 2, line 1, change "reliance of damages" to
"reliance damages".

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-2145

DPJ COMPANY LIMITED PARTNERSHIP,

Plaintiff, Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,
AS RECEIVER FOR BANK OF NEW ENGLAND, N.A.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Torruella, Circuit Judge,

Coffin, Senior Circuit Judge,

and Boudin, Circuit Judge.

Robert D. Loventhal with whom Robert D. Loventhal Law Office was

on brief for appellant.
Gregory E. Gore, Counsel, Federal Deposit Insurance Corporation,

with whom Ann S. DuRoss, Assistant General Counsel, and Robert D.

McGillicuddy, Senior Counsel, were on brief for appellee.

July 27, 1994

BOUDIN, Circuit Judge. DPJ Company Limited Partnership

("DPJ") is a Massachusetts real estate developer. On

February 12, 1988, it entered into a commitment letter

agreement with the Bank of New England. Subject to various

conditions being satisfied, the agreement contemplated the

creation of a three-year $2.5 million line of credit on which

DPJ could draw to finance primary steps in land development

ventures (e.g., deposits, option payments, and architectural

and engineering services).

The commitment letter provided that the creation of the

line of credit--an event called the "closing" (as in

"closing" a deal)--would occur after DPJ met various

requirements, such as the delivery to the bank of certain

documents, appraisals, and the like. DPJ also had to pay a

non-refundable loan commitment fee of $31,250 immediately.

In satisfying the conditions, DPJ spent a total of

$180,072.37 in commitment fees, closing costs, legal fees,

survey costs, points, environmental reports and other such

items.

The line of credit was "closed" on July 23, 1988.

Between that time and January 6, 1991, DPJ borrowed

approximately $500,000 from the bank pursuant to the line of

credit. The bank failed on January 6, 1991. On February 1,

1991, the bank's receiver, the Federal Deposit Insurance

Corporation, disaffirmed the line of credit agreement

-2-

pursuant to its statutory authority to repudiate contracts of

failed banks. 12 U.S.C. 1821(e)(1). Although the FDIC may

repudiate such contracts, the injured party may under the

statute sue the FDIC as receiver for damages for breach of

contract; but, with certain exceptions, the injured party may

recover only "actual direct compensatory damages," 12 U.S.C.

1821(e)(3)(A)(i), and may not recover inter alia "damages

for lost profits or opportunities." Id. 1821(e)(3)(B)(ii).

On May 22, 1991, DPJ filed an administrative claim with

the FDIC to recover the costs and expenses it incurred

pursuant to the commitment letter mentioned to obtain the

line of credit. 12 U.S.C. 1821(d)(5). The FDIC disallowed

the claim. DPJ then brought suit in the district court to

recover its claimed damages. Id. 1821(d)(6)(A). Both

sides moved for summary judgment.

The district court entered a decision on September 10,

1993, denying recovery to DPJ. The court concluded that DPJ

was "really seek[ing] to recoup its closing costs as

compensation for its lost borrowing opportunity resulting

from the FDIC's disaffirmance." In substance, the court held

that the "loss of borrowing capability" does not constitute

"actual direct compensatory damages." In support of its

decision it cited and relied upon Judge Zobel's decision in

FDIC v. Cobblestone Corp., 1992 WL 333961 (D. Mass. Oct. 28,

1992). DPJ then appealed to this court.

-3-

The critical statutory phrases--"actual direct

compensatory damages" and "lost profits and opportunities"--

have been the recurrent subject of litigation. See, e.g.,

Howell v. FDIC, 986 F.2d 569 (1st Cir. 1993); Lawson v. FDIC,

3 F.3d 11 (1st Cir. 1993). We have read the limitation of

recovery to compensatory damages, and the exclusion barring

lost profits or opportunities, against the background of

Congress' evident purpose: "to spread the pain," in a

situation where the assets are unlikely to cover all claims,

by placing policy-based limits on what can be recouped as

damages for repudiated contracts. Howell, 986 F.2d at 572;

Lawson, 3 F.3d at 16.

Contract damages are often calculated to place the

injured party in the position that that party would have

enjoyed if the other side had fulfilled its part of the

bargain. Subject to various limitations, lost profits and

opportunities are sometimes recovered under such a "benefit

of the bargain" calculation. A. Farnsworth, Contracts

12.14 (2d ed. 1990); C. McCormick, Damages, 25 (1935). Yet

where an injured claimant cannot recover the full benefit of

the bargain--for example, because profits cannot be proved

with sufficient certainty--there is an alternative, well-

established contract damage theory:

[O]ne who fails to meet the burden of
proving prospective profits is not
necessarily relegated to nominal damages.
If one has relied on the contract, one

-4-

can usually meet the burden of proving
with sufficient certainty the extent of
that reliance . . . . One can then
recover damages based on reliance, with

deductions for any benefit received
through salvage or otherwise."

Farnsworth, supra, 12.16, at 928 (emphasis added).

As McCormick has explained, "[t]his recovery is strictly

upon the contract," McCormick, supra, 142 at 583. It is

not a remedy for unjust enrichment, nor is it rescission of

the contract. It is a contract damage computation that

"conform[s] to the more general aim of awarding compensation

in all cases, and [it] departs from the standard of value of

performance only because of the difficulty in applying the

[latter standard]." Id. at 583-84. See generally In re Las

Colinas, Inc., 453 F.2d 911, 914 (1st Cir. 1971) (citing

numerous authorities), cert. denied, 405 U.S. 1067 (1972).

Subject to common-law limitations, to which we shall

return in due course, expenditures by DPJ in fulfilling its

part of the bargain can properly be recovered as compensatory

damages under this alternative reliance theory. Certainly

damages so computed do not offend the terms of the federal

statute. The FDIC does not dispute that the $180,072.37 in

costs and expenses were "actual" expenditures. And, as they

were apparently made to fulfill specific stipulations laid

down by the bank, the resulting damages can fairly be

described as "direct," a term normally used to filter out

damages that are causally remote, unforeseeable or both.

-5-

Farnsworth, supra, at 12.14-12.15.

Similarly, DPJ's expenditures are not, by any stretch of

literal language, "lost profits or opportunities." One might

argue that since lost profits and opportunities are

unrecoverable, the recovery of reliance damages would also

offend the policy of the statute. But the policy underlying

the statutory ban on lost profits and opportunities is

Congress' apparent view that these benefits have, in some

measure, an aspect of being windfall gains. This same policy

is reflected in the disallowance of punitive or exemplary

damages, 12 U.S.C. 1821(e)(3)(B)(i), and damages for future

rent when the FDIC disaffirms a lease and surrenders property

previously leased by the bank. Id. 1821(e)(4)(B).

There is normally no windfall involved in the recovery

of reliance damages. DPJ is seeking to recapture money

actually spent under the commitment letter agreement to

obtain a line of credit that the FDIC has now repudiated.

Whether or not one shares Congress' belief that "lost profits

and opportunities" are a special category of damages which

should be disfavored, that policy is not even remotely

offended by returning DPJ its out-of-pocket expenditures

which, because of the FDIC's repudiation, have made DPJ's own

expenditures (at least in part) fruitless.

The district court called DPJ's claim one to recover for

a "lost opportunity" since the breach of contract deprived

-6-

DPJ of the opportunity to secure further loans. This could

be so if, as in Cobblestone, DPJ were claiming profits that

would have been realized through further loans.1 It might

be arguably so (we do not decide the point) if DPJ was

claiming as damages the cost of securing a substitute line of

credit. But reliance damages do not compensate for a lost

opportunity; they merely restore to the claimant what he or

she spent before the opportunity was withdrawn.

In sum, DPJ has claimed reliance damages in this case

and we hold that reliance damages--or at least those claimed

by DPJ--are "actual direct compensatory damages," are not

compensation for "lost profits and opportunities," and are

not barred by Cobblestone. Construction of the quoted

statutory phrases is, of course, a matter of federal law, and

the concept of reliance damages has long been recognized both

in federal litigation, Rumsey Mfg. Corp. v. United States

Hoffman Mach. Corp., 187 F.2d 927, 931-32 (2d Cir. 1951) (L.

Hand), and in Massachusetts. Air Technology Corp. v. General

Elec. Co., 199 N.E.2d 538, 549 n.19 (Mass. 1964).

When we turn to the final issues in this case--the

common-law limitations on reliance damages--the choice of

1In Cobblestone, the company took the position that it

had lost approximately $5 million because the FDIC repudiated
a line of credit used by Cobblestone to finance equipment
that it expected to lease to customers. We agree with the
denial of such a lost-profits recovery in Cobblestone, but

think the decision quite distinguishable.

-7-

governing law is more debatable. The underlying obligation

on which DPJ sues is a contract created by Massachusetts law.

Federal law imposes statutory limits on the damages that may

be awarded against the FDIC when it repudiates the contract.

Whether the nuances and qualifications that shape reliance

damages should be decided under Massachusetts law, federal

law or conceivably both is an interesting question. It need

not be answered here, because Massachusetts' view of reliance

damages does not appear to depart from general practice. We

turn, then, to possible common-law limitations on DPJ's

recovery of reliance damages in this case.

First, because reliance damages seek to measure the

injured party's "cost of reliance" on the breached contract,

"an injured party cannot recover for costs incurred before

that party made the contract." Farnsworth, supra, 12.16,

at 928 n.2. The FDIC in this case argues that, at the time

DPJ made its expenditures, the bank had no obligation to make

a loan at all, for that obligation arose only after the bank

later made a discretionary judgment to "close" the

transaction and establish the line of credit. Farnsworth,

supra, 12.16, at 928 n.2. The FDIC concludes that DPJ's

pre-loan expenditures were not made in reliance upon the line

of credit promise but were made in order to secure it.

This will not wash. The commitment letter was itself an

agreement that gave rise, upon the satisfying of conditions,

-8-

to the bank's obligation to create and maintain DPJ's line of

credit. Whether the bank reserved for itself the discretion

to refuse to close (e.g., if dissatisfied with the documents

submitted to it), the DPJ expenditures were made pursuant to

the agreement and so "in preparing to perform and in part

performance" by DPJ. McCormick, supra, 142, at 583. As a

practical matter, companies do not normally spend almost

$200,000 in satisfying loan conditions without very good

reason to expect that the loan itself will be approved.

Thus, we think it is unrealistic to separate the expenditures

by DPJ from the bank's promise to provide the line of credit

and to make loans pursuant to it.

Second, where full performance of a contract would have

given claimant no benefit, or at least less than the reliance

damages claimed, this fact may justify limiting or

disallowing reliance damages. The notion is that claimant

should on no account get more than would have accrued if the

contract had been performed. Farnsworth, supra, 12.16, at

930 & nn. 11-14 (citing cases). Prior to the bank's closing,

DPJ had borrowed only $500,000; DPJ in turn says that it was

preparing to borrow further on its line of credit when the

FDIC put an end to the opportunity. If it has not waived the

issue, on remand the FDIC might conceivably try to show that

DPJ would in fact not have borrowed further on the line of

credit and, therefore, that DPJ had in fact received

-9-

everything it would have received had FDIC not disaffirmed

the line of credit agreement.

Third, a reliance recovery may be reduced to the extent

that the breaching party can prove that a "deduction" is

appropriate "for any benefit received [by the claimant] for

salvage or otherwise." Farnsworth, supra, 12.16, at 928-29

& nn. 1, 3 & 7 (citing cases). Compare Restatement (Second),

Contracts 349 (benefits not mentioned). It is an

intriguing question whether, assuming that the issue is open,

there should be any deduction for the benefit already

received by DPJ by virtue of the $500,000 in loans actually

made and, if so, how that deduction should be measured.

These are by no means easy issues to resolve in the

abstract. On the one hand the FDIC could argue, if it has

not waived the issue, that DPJ received some portion of

benefits promised by the agreement, such as 20 per cent of

the potential loan amount ($500,000 out of $2.5 million) or

the availability of credit for two and one half of the

promised three years. On the other hand DPJ might have

arguments as to why no equitable offset is proper. Neither

side has briefed the relatively sparse caselaw pertaining to

a possible deduction for benefits received where reliance

damages are claimed.

There is no indication that the FDIC argued in the

district court that DPJ would assuredly have declined to

-10-

borrow further on the line of credit or that a deduction from

the amount claimed should be made to account for benefit

received. Certainly no such arguments have been made in this

court. If the FDIC does press such arguments on remand, the

district court can determine whether the arguments have been

waived by a failure to assert them in a timely manner.

The judgment of the district court is vacated and the

matter remanded for further proceedings consistent with this

opinion.

-11-