**John R. McCARRON, Appellant,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Meritor Savings Bank and in its own capacity.**

No. 96–1123.

United States Court of Appeals, Third Circuit.

Argued Sept. 11, 1996.

Decided May 1, 1997.

Jeffrey B. McCarron (argued), Swartz, Campbell & Detweiler, Philadelphia, PA, for Appellant.

Jaclyn C. Taner (argued), Federal Deposit Insurance Corporation, Washington, DC, Henry K.W. Woo, Laurdea & Associates, Philadelphia, PA, for Appellee.

Before: COWEN, LEWIS and WEIS, Circuit Judges.

## OPINION OF THE COURT

LEWIS, Circuit Judge.

John R. McCarron, a former executive of Meritor Savings Bank, appeals from an order of the district court entering judgment for the defendant, the Federal Deposit Insurance Corporation, on his claims to recover severance pay and retirement benefits pursuant to the terms of his employment agreement with Meritor. The issues raised in this appeal are whether the district court erred in determining: (1) that McCarron's severance agreements fell within the scope of the FDIC's valid repudiation of "severance pay" under our ruling in *Hennessy v. FDIC,* 58 F.3d 908 (3d Cir.1995); and (2) that McCarron's retirement benefits had not accrued and did become unconditionally fixed on or before the time Meritor was declared insolvent.

For the reasons which follow, we conclude that the FDIC's repudiation of McCarron's Severance Compensation Agreement was valid, and that no triggering event occurred which would entitle McCarron to severance payment under his Change in Control Agreement. Accordingly, we will affirm the district court's order on this issue; however, we will reverse and remand for further proceedings the district court's conclusion that McCarron's retirement agreement was not vested at the time Meritor was placed into receivership.

## I.

In August, 1988, McCarron left his employment as a partner in a Philadelphia law firm to accept the position of Executive Vice President and General Counsel to Meritor Savings Bank, also in Philadelphia. McCarron entered into an employment contract with Meritor whereby McCarron would leave the law firm partnership and work for Meritor in exchange for a promise by Meritor to pay severance benefits under either of two mutually exclusive agreements. An "Agreement for Compensation On Discharge Subsequent to a Change in Control" provided that if the Bank discharged McCarron without cause in a "change in control," Meritor would agree to pay McCarron a lump sum severance payment in an amount equal to three times his annual salary, and to extend insurance benefits for 36 months. In the event that McCarron was discharged under circumstances other than a change in control, a "Severance Compensation Agreement" provided that McCarron would receive twice his annual salary, as well as the continuation of certain health, accident and life insurance benefits for an additional 24 months.

McCarron was also covered under two additional plans. The "Separation Pay Plan," an ERISA-qualified employee welfare benefit plan covering all of Meritor's employees, provided severance pay based upon years of service with Meritor. In addition, Meritor provided McCarron coverage under its "Supplementary Unfunded Retirement Plan," a non-qualified pension plan providing retirement payments to highly paid executives to supplement those available under its qualified pension plan.

On December 11, 1992, the Secretary of Banking for the Commonwealth of Pennsylvania closed Meritor and appointed the FDIC as receiver. The FDIC entered into a purchase and assumption agreement with Mellon Bank the same day. Mellon Bank assumed Meritor's deposit liabilities and certain other liabilities, and purchased certain Meritor assets. The FDIC, as receiver, retained the liabilities not assumed by Mellon, along with the unpurchased Meritor assets, and proceeded to liquidate them for the benefit of Meritor's approved creditors.

On the day of the FDIC's appointment as receiver, McCarron attended a meeting along with other Meritor employees. The FDIC's Closing Manager, Jack Goodner, made a brief presentation. When he finished his remarks, a Meritor employee asked him whether severance benefits would be paid. Goodner thought not, but was unsure. After looking toward two other FDIC officials for guidance, both of whom shook their heads, Goodner responded "no." At the time this statement was made, neither Goodner nor the other FDIC representatives present were aware of the existence of McCarron's employment agreement. The FDIC asserts that Goodner's statement serves as the basis for the FDIC's repudiation of all McCarron's severance agreements, relying on our decision in *Hennessy v. FDIC*, 58 F.3d 908 (3d Cir.1995), in which we found that Goodner's statement was sufficient to repudiate Meritor's Separation Pay Plan agreements for its other employees.

McCarron timely filed a claim for severance pay and pension payments with the FDIC. Near the expiration of the statutory period for the FDIC to consider the claims, the FDIC requested that McCarron agree to a six month extension, which he did. The FDIC failed to act on McCarron's claims within that six-month period.

The FDIC's inaction prompted McCarron to file suit against the FDIC as Meritor's receiver in federal district court. McCarron's suit sought to recover severance and supplemental pension benefits under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1821. He alleged that his severance and retirement agreements remained valid and enforceable against the FDIC in light of our decision in *Hennessy*. In response, the FDIC advanced a very different interpretation of *Hennessy*. It claimed that *Hennessy* compelled the conclusion that the agreements were unenforceable because Goodner's statement constituted a valid repudiation. The district court heard oral argument, after which the parties agreed to submit the case for adjudication on the stipulated facts. The district court then en-

tered summary judgment in favor of the FDIC.

On appeal, McCarron contends that the district court erroneously concluded that the FDIC's repudiation of the Separation Pay Plan, which we found to be valid in *Hennessy* as it related to other Meritor employees, controls McCarron's present claims for severance benefits. Alternatively, McCarron seeks "actual direct compensatory damages" under FIRREA for breach of those agreements. McCarron also invites us to explore the FDIC's "white knight" exception to its general ban on "golden parachutes."[1] Finally, he asserts that the FDIC is equitably and judicially estopped from denying his claims.

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. Our review of a district court's grant of summary judgment is plenary, and we are required to apply the same test the district court should have used initially. *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987) (en banc).

## II.

This case considers the same facts underlying our decision in *Hennessy v. FDIC*, 58 F.3d 908 (3d Cir.1995). At issue is whether the district court properly determined that our finding of valid repudiation in *Hennessy* is controlling in the case of McCarron's present claims for severance pay.

The *Hennessy* plaintiffs were former middle managers of Meritor who sought to recover severance payments pursuant to Meritor's Separation Pay Plan. The district court held that while the "repudiation may have been informal, it was clear, unambiguous and reasonable under the circumstances." *Hennessy v. FDIC*, 858 F.Supp. 483, 488 (E.D.Pa. 1994), *aff'd*, 58 F.3d 908 (3d Cir.1995). On appeal, we were asked to decide whether the FDIC was required to make formal findings that the terms of this plan were "burdensome" and that repudiation was necessary in

order to "promote the orderly administration of the institution's affairs" pursuant to 12 U.S.C. § 1821(e)(1). We held that the FDIC's repudiation of the Separation Pay Plan was valid because "there is no basis in the statute or in the case law for requiring the FDIC, which has discretion in making the decision concerning whether to repudiate, to produce written findings." *Hennessy*, 58 F.3d at 920.

We note at the outset that in *Hennessy*, we were not called upon to address whether the FDIC's repudiation was valid against any agreements other than Meritor's Separation Pay Plans. It is therefore necessary to return once again to the events surrounding the FDIC's repudiation of December 11, 1992 in order to determine which of McCarron's severance agreements were validly repudiated.

### A.

Section (e)(1) of FIRREA delineates the rights and obligations of the FDIC as receiver for a failed financial institution with respect to contracts entered into by the institution before the appointment of the receiver. That provision states that the receiver,

> may disaffirm or repudiate any contract or lease—(A) to which such institution is party; (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

12 U.S.C. § 1821(e)(1).

The receiver has broad discretion to determine what is burdensome, and a court's review of a decision by the FDIC to repudiate is narrowly circumscribed. *1185 Ave. of Americas Associates v. RTC*, 22 F.3d 494, 498 (2d Cir. 1994); *Howell v. FDIC*, 986

---

1. A golden parachute payment "is any payment (or agreement to make any payment) in the nature of compensation by any insured depository institution ... that (i) is contingent on the termination of such party's affiliation with the institu-

tion or holding company; and (ii) is received on or after the date on which (II) any conservator or receiver is appointed for such institution...." 12 U.S.C. § 1828(k)(4).

F.2d 569, 572 (1st Cir.1993) ("[a] litigant would normally have an uphill battle in overturning an FDIC finding of 'burden'...."). Once the receiver makes a finding that a contract is burdensome, it does not have to give reasons for its decision. *1185 Ave. of Americas Assoc.*, 22 F.3d at 498; *Morton v. Arlington Heights Federal Savings and Loan Association*, 836 F.Supp. 477, 485 (N.D.Ill.1993).

■ Thus, the relevant issue in reviewing the FDIC's decision to repudiate is not whether the FDIC official "considered everything possible in making [his] determinations or even whether he reached the 'right' decision; the question is whether he made the determination required ... [e]ven if the determinations were based on incorrect perceptions of fact or incorrect assumptions about the governing law." See *Employees' Retirement System of Alabama v. RTC*, 840 F.Supp. 972, 983 (S.D.N.Y.1993). The receiver's repudiation decision will not be overturned absent an abuse of discretion. *Atlantic Mechanical, Inc. v. RTC*, 772 F.Supp. 288 (E.D.Va.1991), *aff'd*, 953 F.2d 637 (4th Cir. 1992).

The receiver is required, however, to decide "within a reasonable period" after being appointed whether to exercise such repudiation power. 12 U.S.C. § 1821(e)(2). See *also, RTC v. CedarMinn Building Ltd.*, 956 F.2d 1446, 1455 (8th Cir.1992) ("The amount of time that is reasonable for the FDIC to exercise its repudiation power under FIRREA must be determined by the circumstances of each case.").

■ In the context of informal repudiations of contracts under FIRREA, like the one at issue here, a valid repudiation requires that the receiver, after making its determination that a contract or a particularized class of contracts is burdensome, repudiates in a manner which is "clear, unambiguous and reasonable under the circumstances." *Hennessy*, 858 F.Supp. at 488; *see also Lawson v. FDIC*, 3 F.3d 11, 12 (1st Cir.1993).

### B.

■ To support his contention that his Severance Compensation Agreement was never repudiated and remains a valid obligation of the receiver, McCarron points to the fact that the FDIC's repudiation was made in the context of a discussion regarding employee benefits in general, and that the FDIC closing team admitted that they had no knowledge of the existence of McCarron's agreements.

At first glance, McCarron's argument appears compelling. We are reluctant to impute to Goodner's repudiation, which was a response to a question whether severance would be honored, an intention to repudiate a contract where that intention may not have existed. Indeed, it would be highly speculative for us to impute to Goodner's statement anything more than an intention to repudiate standard severance packages, for that was the focus of the question to which Goodner was responding. However, we believe that the FDIC's lack of specific knowledge of McCarron's Severance Compensation Agreement is inconsequential.

As we noted above, a receiver's determination as to whether a contract is burdensome to an institution will not be overturned but for an abuse of discretion. Even if the decision to repudiate Meritor's severance agreements had been made pursuant to a uniform policy of the FDIC to repudiate all severance pay agreements, it would still be proper. *Hennessy*, 58 F.3d at 920 ("If anything, such a longstanding policy [to consistently deny the same type of claim] demonstrates a conscious decision to promote uniform treatment of the same type of claim."). Under the circumstances surrounding the FDIC's repudiation, we are satisfied that it did not abuse its discretion in determining that, as a general matter, the payment of any and all severance claims would further burden a banking institution in financial ruin.

■ The question then arises whether the FDIC communicated clearly and unambiguously to McCarron that his Severance Compensation Agreement was repudiated. As we noted above, a valid repudiation under FIRREA requires that a receiver actually

determine that a contract or particularized class of contracts is burdensome, and communicate repudiation of such contracts in an unambiguous manner. Here, Goodner was asked, on the day the FDIC was appointed receiver, whether "severance would be honored," to which he unambiguously responded "no." In our view, this repudiation was sufficient to place McCarron on notice that his Severance Compensation Agreement, which was a standard severance agreement virtually indistinguishable from the Separation Pay Plans, was likewise deemed to be a burden to the estate of Meritor. Thus, the FDIC's repudiation of McCarron's Severance Compensation Agreement was "clear, unambiguous and reasonable under the circumstances." *Hennessy v. FDIC*, 858 F.Supp. 483, 488 (E.D.Pa.1994); *cf. Lawson v. FDIC*, 3 F.3d 11, 12 (1st Cir.1993) (repudiation of CD contracts was informal, but it was unambiguous, and therefore valid). The FDIC's repudiation of December 11, 1992, was therefore valid against this agreement.

■ Because we find that McCarron's Severance Compensation Agreement was properly repudiated, that repudiation gives rise to an ordinary claim for breach of contract. However, in most instances, the types of damages that may be recovered against the FDIC are limited to "actual direct compensatory damages," calculated as of the date of the appointment of the receiver. 12 U.S.C. § 1821(e)(3)(B).[2] In *Hennessy*, we explained that severance payments are " 'at best an estimate of likely harm made at a time when only prediction is possible' and are analogous to 'liquidated damages.' " *Hennessy*, 58 F.3d at 921 (citing *Howell v. FDIC*, 986 F.2d 569, 573 (1st Cir.1993)). We concluded, therefore, that damages relating to severance benefits are not compensable as "actual direct compensatory damages" under 12 U.S.C. § 1821. *Hennessy*, 58 F.3d at 921. In light of that conclusion, which we find

equally applicable here, we will affirm the district court's order in favor of the FDIC on this issue.

### C.

■ McCarron also argues that his Change in Control Agreement was never repudiated and therefore remains a valid obligation of the receiver. With respect to this agreement, we need not reach the question of repudiation, since the triggering events contemplated by it never occurred.

McCarron's Change in Control agreement defined a change in control as occurring when, among other things, there is "any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all, or substantially all the assets of Meritor or its parent, or [by virtue of] the adoption of any plan or proposal for the liquidation or dissolution of Meritor." App. at 90. In order for such a change in control to trigger McCarron's entitlement to severance pay, the terms of the agreement itself require approval of "[t]he Board of Directors of Meritor or its parent [or, if such approval is not legally required, the shareholders]."

The "change in control" which took place when the Secretary of Banking for the Commonwealth of Pennsylvania closed Meritor was not one which was contemplated by McCarron's Change in Control agreement. In fact, the closing of Meritor effectively foreclosed the possibility of obtaining the requisite approval to make McCarron's agreement enforceable. Because there was no event that triggered the payment of severance benefits under this contract, we will affirm the district court's order denying McCarron's claim in this respect, also. *See also Hennessy*, 58 F.3d at 918 (observing that when there is no event triggering the payment of severance benefits, it is ordinarily unnecessary to dispose of repudiation and

---

**2.** FIRREA provides, in part, that:
the liability of the conservator or receiver for the disaffirmance or repudiation of any contract pursuant to paragraph (1) shall be—
(i) limited to actual direct compensatory damages; and (ii) determined as of—(I) the date of the appointment of the conservator or receiver. . . .

12 U.S.C. § 1821(e)(3)(A). FIRREA further provides that "actual direct compensatory damages" do not include:
(i) punitive or exemplary damages; (ii) damages for lost profits or opportunity; or (iii) damages for pain and suffering.
12 U.S.C. § 1821(e)(3)(B).

damages issues in connection with severance pay).

## III.

 As an alternative ground for the payment of his severance claims, McCarron asserts that he qualifies for payment under the FDIC's rules permitting an institution to make golden parachute payments to a so-called "white knight."[3] The FDIC has acknowledged its awareness that,

> individuals who possess the experience and expertise which qualify them for [a position with a federally regulated institution or holding company] are highly sought after business persons who, in most circumstances, already have established successful careers with other financial institutions. In order to induce such an individual to leave an established, stable career for a job in a troubled institution which may not survive regardless of that individual's efforts, it is generally necessary to agree to pay that individual some sort of severance payment in the event that the efforts of the individual for the institution are not successful. It is the FDIC's view that ... such agreements reflect good business judgment.

60 FR 16069, 16071 (March 29, 1995). But the FDIC's "white knight" exception to the ban on golden parachute payments is also subject to clearly defined limitations. The FDIC's rule itself, set out at 12 C.F.R. § 359.4, states that:

> (a) An insured depository institution or depository institution holding company may agree to make or may make a golden parachute payment if and to the extent that ...
>
> (2) Such an agreement is made in order to hire a person to become an IAP [Institu-

tion-affiliated party] either at a time when the insured depository institution or depositor institution holding company satisfies or in an effort to prevent it from imminently satisfying any of the [enumerated factors involving insolvency], and the institution's appropriate federal banking agency and the Corporation consent in writing to the amount and terms of the golden parachute payment.

\* \* \* \* \* \*

In the event that the institution is placed into receivership or conservatorship, the FDIC and/or the institution's appropriate federal banking agency shall not be obligated to pay the promised golden parachute and the IAP shall not be accorded preferential treatment on the basis of such prior approval.

Thus, while McCarron may very well be a "white knight" under the terms of the FDIC regulation, he has failed to meet the requirement that the appropriate federal banking agency and the FDIC "consent in writing to the amount and terms of the golden parachute payment." 12 C.F.R. § 359.4. And because McCarron never obtained the requisite consent from the FDIC, there is no factual or legal basis to permit payment of McCarron's severance claims under the FDIC rules governing the white knight exception.

 Moreover, even if McCarron had obtained written approval, the FDIC's regulations provide that "the appropriate federal banking agency shall not be obligated to pay the promised golden parachute ... on the basis of such prior approval." 12 C.F.R. § 359.4(a)(2). Because Congress empowered the FDIC to prohibit, limit or eliminate golden parachute payments altogether, pursuant to 12 U.S.C. § 1828(k)(1), we have no doubt

---

**3.** The white knight concept, of course, has its origins in the tale of the valiant knight who rescues the damsel in distress. In corporate law, the term white knight is usually meant to describe a "friendly suitor," and a "rival bidder that will save [a target company] from the first offeror by offering both the shareholders and themselves a more attractive deal." Robert C. Clark, Corporate Law 572 (1986). By way of comparison, a "gray knight" is simply a not-so-friendly third party that makes a competing bid.

*See* Robert A. Prentice, Target Board Abuse of Defensive Tactics: Can Federal Law be Mobilized to Overcome the Business Judgment Rule?, 8 J. Corp. Law 337, 360 (1983). The FDIC uses the term white knight to refer to a highly sought after business person recruited by a troubled institution to reverse its slide toward economic failure. *See* 60 F.R. 16069, 10672. Under the FDIC regulations, such a business person is also called an "Institution-affiliated party." 12 C.F.R. 359.1(h).

that the FDIC acts within its broad discretion even if it chooses to pre-approve golden parachute payments and then later revoke that approval when an institution is placed into receivership. *See, e.g., Hennessy,* 858 F.Supp. at 487 ("The FDIC may prohibit or limit any golden parachute payments regardless of whether such payment is fixed and certain at the time of the institutions' insolvency."); *Westport Bank & Trust Co. v. Geraghty,* 865 F.Supp. 83, 85–86 (D. Conn.1994) (notwithstanding the designation of golden parachute payments as "trusts," the FDIC had statutory authority to disallow claims).

## IV.

McCarron also argues that the FDIC is equitably and judicially estopped from denying his severance payments. In support of his equitable estoppel argument, McCarron contends that the FDIC was aware of his severance agreements but did not object to them, and did nothing to discourage him from relying on the security of the agreements. In addition, McCarron argues that the FDIC's position here is inconsistent with that which it took in prior litigation.

■ A judgment for McCarron on a theory of equitable estoppel would require us to find (1) a material misrepresentation, (2) reasonable reliance upon the misrepresentation, and (3) damage resulting from the misrepresentation. *Heckler v. Community Health Serv., Inc.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984); *Gridley v. Cleveland Pneumatic Co.,* 924 F.2d 1310, 1319 (3d Cir.1991). Here, McCarron never established that the FDIC represented that he would be able to collect severance payments in the event that Meritor were placed in receivership. Moreover, McCarron cannot demonstrate reliance on the FDIC's regulation, issued more than three years after he accepted employment. We therefore reject McCarron's equitable estoppel claim.

■ McCarron also contends that the FDIC should be judicially estopped from denying his claims due to the position it took in prior litigation. The prior litigation that McCarron refers to is the case of *Howell v. FDIC,* 986 F.2d 569 (1st Cir.1993), where the

FDIC made various statements in its brief regarding the white knight exception to the ban on golden parachute payments.

■ Judicial estoppel prevents a party from assuming a position inconsistent with one which it took in a prior proceeding. *Government of the Virgin Islands v. Paniagua,* 922 F.2d 178, 183 (3d Cir.1990); *Murray v. Silberstein,* 882 F.2d 61, 66 (3d Cir.1989) ("the law of this circuit bar[s] switches of position of this kind"); *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 419 (3d Cir.1988). The purpose of judicial estoppel is to prevent a party from playing "fast and loose" with courts by asserting contradictory positions. *United States v. Vastola,* 989 F.2d 1318, 1324 (3d Cir.1993).

In its *Howell* brief, the FDIC asserted that the elements of the white knight exception to the ban on golden parachute payments are (1) commencement of employment when the institution was financially troubled, (2) the promise to make golden parachute payments arises at the outset of employment, (3) the person receiving the payment cannot be responsible for misconduct or the failure of the institution and (4) the proposed rules would not permit an exception in the absence of the FDIC's prior written approval of the payment. App. at 457.

In the course of the *Howell* litigation, the FDIC merely referred to a "white knight" exception in its brief in an attempt to argue that public policy does not favor paying golden parachute benefits in circumstances where claimants had not been hired to help rescue a failing institution. Specifically, the FDIC noted that to overcome the general presumption against the payment of golden parachute payments, a claimant must fall under one of three narrowly-defined situations, which the plaintiffs in *Howell* did not. Speaking of the white knight exception, the FDIC explained that this exception could apply to "employees who, with full and unambiguous written prior approval by the FDIC and the appropriate regulatory authority, are induced to *leave* a stable position with another institution in order to try to prevent a troubled institution's failure. The exception thus has two key elements substantially limiting its

scope." (emphasis in original). FDIC *Howell* Brief at 18. We find no inconsistency between the position the FDIC took in *Howell* and that which it takes here.

Moreover, the FDIC has not argued that the "white knight" exception to golden parachutes is invalid. To the contrary, the FDIC merely maintains that because McCarron failed to obtain prior written approval from the FDIC, there is no factual or legal basis for applying FDIC rules to permit payment of McCarron's claims. Since obtaining such approval is a condition precedent to the application of FDIC rules permitting payment, McCarron's judicial estoppel claim must also fail. *See* 12 U.S.C. § 1828(k)(1) (authorizing the FDIC to "prohibit or limit, by regulation or order, any golden parachute or indemnification payment").

### V.

The validity of McCarron's "Supplementary Unfunded Retirement Plan" claim hinges upon whether his supplemental pension benefits had vested at the time of FDIC receivership. *See Hennessy,* 58 F.3d at 918 ("To establish a claim against an insolvent bank in receivership, the liability of the bank must have accrued and become unconditionally fixed on or before the time it is declared insolvent.").

The district court determined that the provisions of this plan required that McCarron be employed at Meritor for five years before his entitlement to those benefits became vested. Because McCarron did not meet this requirement, the district court entered summary judgment in the FDIC's favor, denying the claim.

 McCarron asserts that by virtue of his employment at Meritor, he is entitled to an accrued benefit under the retirement plan. He relies on paragraph seven of his initial employment contract, of which the district court opinion makes no mention. That paragraph states that "the retirement provisions of [McCarron's] agreement will have the practical effect of fully vesting [him] in the amount [he] accrue[s] at Meritor, *regardless of [his] length of service.*" (emphasis added).

It is not disputed that Meritor waived the requirement for years of service in the Supplementary Unfunded Retirement Plan in order to compensate McCarron for the pension benefits from his prior employer that he surrendered when he accepted employment at Meritor. Nor do we see how this could reasonably be contested in view of the above-cited language of paragraph seven, which could not be any clearer. Accordingly, because the basis for the district court's denial of this claim was that McCarron's retirement benefits "had not vested" at the time of receivership, and this clearly is not the case, the district court's order will be reversed and remanded to determine the amount, if any, of accrued benefits to which McCarron is entitled under his retirement plan.

### VI.

For the foregoing reasons, we will affirm the district court's grant of summary judgment with respect to McCarron's severance claims. In addition, we will reverse the district court's order with respect to McCarron's retirement claim under the Supplementary Unfunded Retirement Plan and remand for further consideration in light this opinion.[4]

---

4. McCarron has submitted additional information to this Court pursuant to Rule 28(j) of Fed. R. of Appellate Procedure. The two documents are the FDIC's motion to intervene and substitute itself as party plaintiff to assert claims for damages to the failed financial institutions, and an accompanying memorandum. The memorandum indicates that Meritor Bank has sufficient assets to pay all creditors. McCarron therefore implies that the FDIC abused its discretion in finding his employment agreement to be a burden to the Meritor estate.

However, even assuming that the Meritor estate is solvent, we are not in possession of facts which indicate when and how it became solvent and we are not willing to evaluate the FDIC's initial repudiation decision using 20/20 hindsight. Therefore, the fact that the FDIC appears

to indicate in the memorandum, dated October 21, 1996, that Meritor is now solvent does not affect our decision.